BROOKHAVEN STEAM LAUNDRY, et al. *v.* WATTS, et al.

Nov. 26, 1951.

No. 38055 (55 So. (2d) 381)

On Suggestion of Error

June 9, 1952 (59 So. (2d) 294)

570

Butler, **Snow** & **O'Mara**, for appellants.

**Cohn, Hobbs & Hobbs,** for appellees.

Butler, Snow & O'Mara, in reply.

578

Butler, Snow & O'Mara, for appellants.

Cohn, Hobbs & Hobbs, for appellees.

582

**Ethridge, C.**

Appellees, Katherine L. Watts and Ronny Watts, are the wife and minor son of Charles Watts, who was shot and killed by a customer of the appellant, Brookhaven Steam Laundry. The other appellant is the insurance carrier, Utica Mutual Insurance Company. Appellees were granted an award of compensation under the Mississippi Workmen's Compensation Act. Miss Laws 1948, Chap. 354, amended by the Laws of 1950, Chap. 412 (only the 1948 act is applicable here). The order of the hearing examiner was affirmed by the Workmen's Compensation Commission and by the Circuit Court of Copiah County. The question is whether there is sufficient evidence to support the finding of the hearing examiner that the death of Charles Watts, resulting from this assault upon him, arose out of his employment and was "because of his employment" within the terms of the statute. For reasons later outlined, we think that the award was properly made and affirm the judgment of the circuit court.

Charles Watts, the deceased, was employed by the Brookhaven Steam Laundry as a route man. His duties were to pick up and deliver laundry and dry-cleaning for the employer. He worked on a commission basis, and was encouraged to obtain additional customers within the territory assigned to him. Crystal Springs was designated by his employer as one of the towns in his territory. The employer also designated Tuesdays and Fridays of each week as the days on which Watts would call on customers of the laundry in Crystal Springs. The truck which he used for his job and all of the expenses of its operation were furnished by the employer. Watts had been working for the laundry for about two years prior to his death. The laundry had on its books a regular customer in Crystal Springs by the name of Henry Garrett.

There were only three witnesses to the shooting who knew anything of its precedent circumstances. They were Henry Garrett, who did not testify and who was not offered by either side; Charles Watts, the deceased; and Mrs. Henry Garrett. Mrs. Garrett testified that she first met Charles Watts sometime in September, 1948. The Garretts were living in a house on Lee Avenue in Crystal Springs. Lee Avenue runs east and west, and the house is on the north side of the street facing south. It had a small porch on the front. The living room door, with a screen door on it, faced south, and to the right as one goes up the front steps is a bedroom door, which entrance at the time of the shooting also had a screen door. The bedroom door faced west. The two doors were within a few feet of each other, and each screen opened toward the other door.

Mr. Garrett worked in Jackson and left his home about five o'clock A. M., returning around 4:30 P. M. Mrs. Garrett, who worked in a shirt factory in Crystal Springs, was temporarily laid off from work because of a fire in September, 1948. Before that she had been leaving their laundry and dry cleaning with the next door neighbor for appellant laundry to pick up. She testified

that, after she was temporarily out of a job, Watts called at their house for the laundry, and that after several meetings she and Watts began to have a love affair and regular sexual intercourse; that Watts would come to her house on Tuesdays and Fridays, the regular days for his work in Crystal Springs, for 30 to 45 minutes during the noon lunch-hour, and that after she went back to work, she would come home for lunch for the purpose of meeting him; that the Garretts regularly traded with appellant laundry, and that Watts oftentimes would pick up and deliver laundry or dry cleaning on those occasions; and that on other occasions, he would visit with her for personal purposes without picking up or delivering any clothing. She said that she and Watts had an arrangement by which clothing to be cleaned would be placed on a chair on the porch as a signal to Watts that he could come in the house. Apparently in most instances the clothing was also put out for him to pick up and have cleaned and pressed.

Watts had at least one other customer in the immediate neighborhood, the Jones, who lived next door to the east of the Garrett house. On most occasions when Watts would call he would leave his laundry truck in front of the Garrett house, and at other times partly between the Garretts' and the Jones' houses. On the day of the shooting of Watts, April 19, 1949, Mrs. Garrett returned from work to her house around 12:10 P. M. She placed a suit of her husband's on the chair on the porch, and she said that this was a signal that Watts could stop and come in the house. She also stated that her husband had previously "told me to have it cleaned and I put the suit out." She "meant for him to carry them with him."

Watts arrived at the house later than usual, at about 12:30 P. M., went up on the porch and talked to Mrs. Garrett for about fifteen minutes. She told him not to come in because she was late and had to get back to work. During this period Watts was standing on the

porch with the screen door to the living room held open, the wooden door being open also. Mrs. Garrett was standing just inside the living room door. She did not remember when Watts picked up the clothing which was to be cleaned, but she said that he had them in his hand for some time while they were talking. She did not know that Garrett, the husband, was in the house. She thought he had gone to work that morning. She and Watts were talking in a normal tone, and she thought her husband could have heard their conversation. Garrett suddenly opened the wooden door to the bedroom. She said that she and Watts had been talking about future meetings between them. When Garrett appeared Watts had the suit of clothes of her husband in his hand. Garrett had a pistol in his hand, which was apparent to both Mrs. Garrett and Watts when he opened the door. She said that Garrett said, "Well, I caught y'all," and that he told Watts to get away from the house and stay away. She then testified as follows:

"Q. What did Mr. Watts do, if anything? A. When Henry spoke we both whirled out of the door and Charles grabbed the door that went into the bedroom—the screen door—and he pulled it open and threw the clothes down. Henry stepped back in the room and asked him to stop and step backwards. When I seen what Charles was going to do, I grabbed for him and Charles said 'Fella, I'll * * * ' and he never did finish the sentence. Henry shot him. And when I grabbed him that finger there—the bullet hit the nail on it.

"Q. The finger of your left hand? A. Yes, sir."

Watts threw the clothing just on the inside of the bedroom door. After Watts fell Mrs. Garrett sat on the edge of the porch with her feet on the first step and held his head in her lap until the ambulance arrived. One of his feet was in the door of the bedroom with the screen door against it. He died shortly after the shooting.

C. B. Ferguson, City Marshal of Crystal Springs, testified that he arrived 5-10 minutes after the shooting

and, speaking of Mrs. Garrett, Ferguson said: "Just a few minutes after I had gotten there and the neighbors began to gang around she said 'I hope all you neighbors are satisfied. All this talk you been doing that you don't know anything about has caused an innocent man to get shot.'"

Mrs. Garrett denied making this statement, but stated that she told the neighbors who had gathered around that she knew they had been talking and she hoped that now they were satisfied.

The examiner found in effect that Garrett did not know Watts personally, and that Garrett had no actual knowledge of the affair and did not suspect Watts individually. Concerning this Mrs. Garrett testified:

"Q. He didn't know Watts, did he? A. I don't know whether he did or not.

"Q. He didn't know who the man was talking to you —correct? A. I don't know what he knew."

After Garrett had opened the bedroom door, Mrs. Garrett manifestly thought that it was apparent that her husband was going to shoot Watts. Speaking of Watts, she said:

"A. I was right there with him. I was kind of in hopes to keep him back, after I seen what was going to happen.

"Q. Your husband was armed with a pistol? A. I saw the pistol when he jerked open the door."

The district Attorney and some police officers, offered by the appellees, testified as to an oral and a written statement made by Garrett after the shooting. This was excluded by the hearing examiner, and since appellees took no cross-appeal thereon, we do not consider those statements or the question of their admissibility. It was shown that Garrett had not been indicted by two succeeding grand juries. The hearing examiner was justified in finding that the testimony of Goolsby, who said he actually saw the shooting, "sheds no light upon the details or circumstances surrounding same," and

that the testimony of Miss Edwards and of Jones and Wilson, neighbors of the Garretts, was of little weight. Neither Jones nor Wilson, who lived on opposite sides of the Garrett home, had ever seen Watts enter the Garrett house. Miss Edwards said she had.

The hearing examiner found that Mrs. Garrett was an admitted adulteress and that "whether the controversy * * * grew out of domestic matters is a matter only Mr. Garrett can clarify inasmuch as Mr. Watts is dead"; that there is a presumption of morality which should be recognized until a preponderance of evidence shows otherwise; that "only by the testimony of suspecting neighbors, whose evidence was largely their opinions, and the admission of Mrs. Garrett, who has little to lose and everything to gain by justifying her husband's act as reason for the shooting, has a reason for the shooting been offered." The examiner found that there was nothing unusual in parking the delivery truck near the Garrett home as it was also shown that Watts collected laundry from others in the neighborhood in addition to the Garrett family; that assuming that an affair did exist between Watts and Mrs. Garrett, the record did not show that Garrett had actual knowledge of the affair or that Garrett suspected Watts as the transgressor; that Watts was on the porch on a regular day and had the clothes for the laundry in his hand; that Mrs. Garrett did not think her husband even knew Watts; that assuming Garrett went to the door to warn Watts or any other man away from the house, "such a presumption, if true, would have led to the shooting of any other party present regardless of his innocence." The examiner thought that even though some personal motive may have made Watts' business trips more interesting, Watts was still at the time in the process of picking up the laundry when shot; that Watts would not have met with the fatal accident if he had not appeared at the Garrett home on the laundry's business that day. Hence, the examiner found that "there is nothing other than conjecture to

show that Garrett suspected Watts or anyone else as the guilty party, or that the shooting actually arose out of an affair between the two. Until conclusively shown that the alleged immoral acts of Watts committed prior to his death, or that the alleged plans for an immoral meeting was overheard and caused the shooting, his dependents should not be deprived of their right to receive compensation.''

The Workmen's Compensation Act is to be given a liberal and sensible interpretation in order to effect its salutary purposes, and doubtful cases should be resolved in favor of compensation. Deemer Lumber Co. v. Hamilton, Miss. 1951, 52 So. (2d) 634. This attitude is adopted by every court which has considered the matter. 58 Am. Jur., Workmen's Compensation, Sec. 27. Moreover, the trier of fact, the hearing examiner, heard the evidence and observed the witnesses, and his findings of fact and conclusions should be affirmed on judicial review unless manifestly wrong or contrary to the overwhelming weight of the evidence. Brown Buick Co. v. Smith's Estate, Miss. 1951, 52 So. (2d) 664; Lucedale Veneer Co. v. Rogers, Miss. 1950, 48 So. (2d) 148, suggestion of error overruled, 1951, 53 So. (2d) 69; see also 58 Am. Jur., Workmen's Compensation, Secs. 530-532.

The "injury" must arise out of and in the course of employment * * *'', Miss. Laws 1948, c. 354, Sec. 4. Sec. 2(2) provides that "injury" includes "an injury caused by the wilful act of a third person directed against an employee because of his employment, while so employed and working on the job." Sec. 2(2) is a partial definition of what the coverage provision, Sec. 4, means. The principal purpose of this provision is to remove the necessity of inquiry as to whether the injury is "accidental". Maryland Casualty Co. v. Cardillo, 1939, 71 App. D. C. 160, 107 F. (2d) 959; 58 Am. Jur. 767. The last phrase of the quoted statute comprehends the requirement of "in the course of" employment. The first

part comprehends the requisite that the injury must "arise out of" the employment. It says that if the wilful act of a third person causes the injury, it is nevertheless within the act, although not accidental, if the act is directed against an employee "because of his employment", that is, having a causal relationship to his employment. The injury must still arise out of the employment under Sec. 4, which includes the situation defined in Sec. 2(2). Both provisions have reference to a causal relationship. There is no uniformity in the terms of analogous provisions or in the cases discussing them. See Anno. 35 A. L. R. 563; 29 A. L. R. 437; 40 A. L. R. 1122; 35 A. L. R. 563; 72 A. L. R. 110; 112 A. L. R. 1258; 6 Schneider, Workmen's Compensation Law, 3d Ed. 1948, Secs. 1560-1567 (containing comprehensive consideration of many cases dealing with assaults); Ibid., pp. 119, 131, 147. Somewhat similar provisions elsewhere have usually been interpreted as comprehending the "arising out of" requirement. Asaeda v. Haraguchi, 1947, 37 Hawaii 556, 559; Hartford Accident & Indemnity Co. v. Hoage, 1936, 66 App. D. C. 160, 85 F. (2d) 417. This is consistent with the apparent legislative intent, and with our opinion in Barry v. Sanders Co., Miss. 1951, 52 So. (2d) 493, where the relationship between these two provisions was not an issue and therefore not considered.

It is manifest that Watts was killed "in the course of" his employment, during his working hours and at a place where he had a right to be to perform his job, or as Sec. 2 (2) says, "while so employed and working on the job". The question is whether his injury and death arose out of his employment within the terms and puposes of the statute.

The employee at the time of his death had driven to Crystal Springs during his regular working hours and on one of his regular days to be there in the employer's truck. Shortly prior to his death, he had picked up a bundle of laundry at the Jones house next door to the Garrett home. It is undisputed that Mr.

Garrett had directed his wife to put the suit of clothes out to be cleaned and pressed, and that they were actually put out on the porch for Watts to pick up for that purpose. Garrett's wife had followed his instructions in doing this. A major purpose of Watts in going on the porch of the Garrett house on April 19 was to obtain the clothes put there to be cleaned and pressed, and to make a profit thereby for himself and his employer. On the occasion in question it is also undisputed that no improper conduct occurred, and that Watts was standing on the front porch, where he had a right to be to do his job, at the time Garrett appeared. Immediately prior to the shooting, Watts had in his hands the suit of clothes which Garrett had directed his wife to put out for the laundry man, and it was the intent of both of the Garretts and of Watts that Watts would take those clothes to the laundry for cleaning.

Under these circumstances, Watts' employment was a substantial contributing cause of his death. Accepting the testimony of Mrs. Garrett as true, Watts went to the porch of their home for two reasons, to see Mrs. Garrett and to pick up the clothes to be cleaned. On the other hand, Mrs. Garrett had two purposes also, to see Watts and to give him the suit to be cleaned, which her husband had instructed her to do. Watts was where his job authorized him to be, on the porch with the clothes to be cleaned in his hands. And that was where he was shot. He was in fact on the porch "because of his employment", to obtain the clothes for cleaning. That while he was on the porch he was also subserving his personal purposes by talking to Mrs. Garrett does not remove or obscure the fact that the demands of his job were a material element and a substantial factor in not only placing him there where he was available to be shot at that time, but also in placing him in a locality and environment and under conditions where a jealous husband with homicidal instincts could kill him.

This proposition is supported both by the common-law principles of master and servant as developed in this state and elsewhere, and also by workmen's compensation decisions. The principle is well stated in 1 A. L. I., Restatement of Agency, Sec. 236: "An act may be within the scope of employment, although done in part to serve the purposes of the servant or of a third person." The editors' comment is: "The fact that the predominant motive of the servant is to benefit himself or a third person does not prevent the act from being within the scope of employment. If the purpose of serving the master's business actuates the servant to any appreciable extent, the master is subject to liability if the act otherwise is within the service. * * * So also, the act may be found to be in the service where not only the manner of acting but the act itself is done largely for the servants' purposes."

In Primos v. Gulfport Laundry and Cleaning Company, 1930, 157 Miss. 770, 128 So. 507, File was an employee of the defendant laundry, and his duties were to pick up and deliver laundry and dry cleaning. For that purpose the laundry furnished him with a truck which when not in use File was to keep at his residence. Some testimony indicated that no limitation was placed on File's hours of work; he was authorized to solicit business and obtain new customers at any time. His regular working hours, however, ended at five in the afternoon. One night he and his wife, in the laundry truck, went to a dance for the purpose, according to his testimony, of soliciting business for the defendant. They were returning from the dance to his residence around 11 o'clock at night when the truck collided with the plaintiff, as a result of which plaintiff sued the laundry for damages. It was held that the jury was entitled to consider whether File was subserving his employer's purposes as well as his personal ones at the time of the collision, and that if he attended the dance in part for his own and his wife's pleasure and also in part to solicit

business for the defendant, he was acting within the scope of his employment when the collision occurred.

The Primos case was followed in Delta Cotton Oil Co. v. Elliott, 1937, 179 Miss. 200, 172 So. 737, suggestion of error overruled, 174 So. 550, and distinguished in Shell Petroleum Corp. v. Kennedy, 167 Miss. 305, 141 So. 335. In Singer Sewing Machine Co. v. Stockton, 1934, 171 Miss. 209, 157 So. 366, 367, the appellee charged that a salesman for the sewing machine company had called at her house, wrongfully attempted to cultivate relations with her while her husband was absent, and offered to leave a sewing machine with her if she would make a date with him. The salesman also tried to sell appellee a sewing machine. Appellee obtained a judgment against the employer for damages for the agent's misconduct. It was said that the agent's acts in pursuance of his principal's business were "so mixed with the acts and conduct of his own pursuits that we cannot say there was a departure from the principal's business. * * * If a servant commingles his personal business with his master's business, the master is liable for the servant's conduct while so engaged."

Employers have been held to be liable in tort for wrongful assaults committed by their servants upon third persons. In most of the cases the personal element was one material factor. White's Lumber & Supply Co. v. Collins, 1935, 186 Miss. 659, 191 So. 105, 192 So. 312; Alden Mills v. Pendergraft, 1927, 149 Miss. 595, 115 So. 713; Richberger v. American Express Co., 1895, 73 Miss. 161, 18 So. 922, 31 L. R. A. 390; Indianola Cotton Oil Co. v. Crowley, 1919, 121 Miss. 262, 83 So. 409; Loper v. Yazoo & M. V. R. R. Co., 1932, 166 Miss. 79, 145 So. 743. Barmore v. Vicksburg, S. & P. R. R. Co., 1904, 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, was the beginning of a long line of cases in this State upholding liability in tort of employers for the wrongful acts of a servant where he has departed or deviated from his employment for

personal reasons and is returning to the job when the act occurred.

These tort cases establish three propositions: (1) An act may be within the scope of employment although done in part to serve the personal purposes of the servant, and the mere fact that the predominant motive of the servant is to benefit or subserve himself does not prevent the act from being within the scope of employment; (2) whether one of the concurring, proximate causes is a purpose to serve the master is a question of fact for the jury or other trier of fact; and (3) in determining such issues of vicarious liability in cases involving personal purposes, assaults, and deviations, the courts have applied realistic attitudes toward the question of whether there is substantial evidence to warrant the jury in finding some material connection between the wrongful act and the employment.

In the field of workmen's compensation law, the authorities take similar attitudes, citing numerous cases to support them. Schneider, in his work on Workmen's Compensation Law, Volume 6, page 59, says: "Two or more causes—Two or more causes may operate to cause the disability of an employee. They are spoken of as 'concurrent', "contributing', 'exciting', and 'superinducing' causes. If all contribute to the ultimate result, they are all proximate causes of that result."

58 Am. Jur., Workmen's Compensation, Sec. 241, elaborates on that proposition: "Effect of Mingling of Purposes of Employer and Employee.—While the question whether a trip taken by an employee in the interest of both himself and his employer is to be regarded as the latter's, so as to warrant allowance of workmen's compensation for injuries sustained in the course thereof, or his own, is in a sense a question of fact, it is a question that must be determined by the application of some legal test or standard. The test ordinarily employed for determining liability in such a case is that, if the work of the employee creates the necessity for travel, he is

in the course of his employment though he is serving at the same time some purpose of his own. This does not, however, require or authorize the weighing of the motives and objects of the employer and employee for the purpose of ascertaining the most important or compelling cause of the journey, but simply requires that the service of the employer be at least a concurrent cause of the trip." See Anno., 78 A. L. R. 684. Horovitz, Workmen's Compensation Laws, 1944, page 153, says that "where any reasonable relation to the employment exists, or the employment is a contributory cause, the court is justified in upholding an award as 'out of' the employment."

In Marks, Dependents v. Gray, 1929, 251 N. Y. 90, 167 N. E. 181, the New York Court, in a dictum, indicated that unless the employee's dominant purpose was to benefit his employer at the time of his injury, where he also had a personal purpose, his injury did not arise out of the employment. This dictum was applied in a number of subsequent cases, even though it was more restricted than the common-law rule. However, most of the courts today take a different approach where the employee was injured during a period when he was acting under a mixture of motives. They refuse to weigh the dual purposes and to try to determine which is dominant. It is enough that there was a concurrent business and personal motive, and "no nice inquiry" will be made to determine the relative importance of each. Phœnix Indemnity Co. v. Industrial Accident Comm., 1948, 31 Cal. (2d) 856, 193 P. (2d) 745; Welch v. North Dakota Workmen's Compensation Bureau, 75 N. D. 608, 31 N. W. (2d) 498. For example, in Kaplan v. Alpha Epsilon Phi Sorority, 1950, 230 Minn. 547, 42 N. W. (2d) 342, 344, a house mother for a sorority house, who was subject to call for twenty-four hours a day, left the sorority house to go to a drug store to buy bandages for the girls and then to go to a synagogue for religious worship. En route to the drug store, she fell on a curb greased by

Halloween pranksters, and broke her hip. The Commission found that her dominant purpose was the personal mission to the synagogue and that her injury, therefore, did not arise out of the employment. The Court reversed and remanded the case for a rehearing. The Court said:

"The application of the dominant-motive or dominant-purpose rule does not call for a construction which arbitrarily holds the entire journey of an employee to be wholly 'fish or fowl' without regard to whether a deviation or detour is involved. An errand or movement of an employee, the purpose of which is dominantly personal, may involve a deviation or detour which is made necessary by the employer's business; and, if an injury occurs during such deviation or detour, it arises out of and in the course of the employment. In a number of cases we have so held. Confusion has apparently resulted from the application of the dominant-purpose test * * *.

"Of course, if the employment creates the necessity for the principal errand in the sense that it would not have been made in the absence of such necessity, the principal errand unquestionably belongs to the employer, although the employee is serving at the same time some purpose of his own."

In Knipe v. Texas Employers Ins. Association, Tex. Civ. App. 1950, 234 S. W. (2d) 274, the Texas Court followed the majority rule in workmen's compensation cases in holding that where there is a business purpose for a trip, it is immaterial that with it there may be joined a personal errand. Ætna Casualty & Surety Co. v. Jones, 1950, 82 Ga. App. 422, 61 S. E. (2d) 293. Apparently the New York Court, which originated the dominant purpose rule in compensation cases, has itself recently limited or repealed that rule and has gone along with the majority view discussed above. Goldman v. Palmer & Oliver, Inc., 1950, 277 App. Div. 194, 98 N. Y. S. (2d) 793. In Lundell v. Walker, 1942, 204 Ark. 871, 165 S. W. (2d) 600, a

plantation foreman fired an employee, Walker. Walker then cursed him, and Scott without reason shot and killed Walker. Compensation was allowed to Walker's wife. Personal and business motives of the foreman and Walker were interwoven and concurrent. The Court did not weigh them. In the present case, assuming the truthfulness of the testimony of Mrs. Garrett, Watts went to the Garrett house for a concurrent business and personal motive. We will not weigh these dual purposes and try to determine which was dominant. That approach, which in past experience has resulted in considerable confusion in compensation cases, has since been rejected by the better reasoned decisions. It is enough that Watts had a concurrent business and personal motive at the time of his injury.

Moreover, the common law theories of deviation, detour, and intervening cause are of questionable value in compensation cases in determining whether the required causation exists. It should also be noted that at the time Watts was shot he was performing a service of benefit to his employer. He was picking up the clothing for cleaning, which would result in a profit for appellant employer. There is no dispute whatever in the record about this. And of course where an act is for the employer's benefit, the required element of causation is plainer. Lockheed Aircraft Corp. v. Industrial Accident Commission, 1946, 28 Cal. (2d) 756, 172 P. (2d) 1.

Under the authority of both of these common law and workmen's compensation precedents, there is substantial evidence to support the finding of the hearing examiner that Watts' job was a concurring, contributing cause of his death. It created the necessity for him soliciting from door to door, and it placed him on the porch where he was killed in the legitimate process of picking up clothing to be cleaned. Moreover, the examiner found in effect that there was no evidence that Garrett heard the conversation between his wife and Watts, and found that Garrett did not know Watts, and that anyone on the

porch at that time and under those circumstances would have been shot by Garrett. We can not say that this finding was unsupported by the evidence. If Garrett was after the laundry man, and he did not know him, he shot him because he determined that he was the laundry man. What Watts was doing just before he was shot holding the clothes in his hands, identified him. If an innocent laundry route man, from some other laundry, or a substitute laundry man from appellant laundry, had come there at that time to solicit the Garrett account, or to pick up clothes, he would probably also have been shot. The obvious injustice of denying such an innocent employee a recovery has been recognized by the better rule in allowing an award under such circumstances. Greenberg v. Voit, 1929, 250 N. Y. 543, 166 N. E. 318; Entrocut v. Paramount Bakery & Restaurant Co., 1928, 222 App. Div. 844, 226 N. Y. S. 808; Hartford Accident & Indemnity Co. v. Hoage, 1936, 66 App. D. C. 160, 85 F. (2d) 417. These and other cases so holding are discussed at a later point in this opinion. Yet the fact of innocence or guilt, or "fault" does not eliminate or disqualify the finding of the examiner that one of the concurrent causes of Watts' death was his employment, the requirements and conditions of his job. To hold otherwise under these circumstances would defeat the plain meaning and purpose of the statute. The rights sought are statutory rights. Section 4 of the Act expressly provides: "Compensation shall be payable for disability or death of an employee from injury arising out of and in the course of employment, *without regard to fault as to the cause of the injury.*" A major purpose of the act was to eliminate fault as a relevant element in industrial injuries, and this purpose must be continually kept in mind in applying the act.

Causation is a fact, a matter of what has in fact occurred, and if the employment was a concurring factor in bringing about the employee's death, it should be regarded as a cause in fact. There is no reason why the

Court, in applying the workmen's compensation act, should adopt a more limited construction of the element of causation from employment than the court has previously adopted in applying a vicarious liability in tort at common law. Yet appellants' argument would reach that result. Causation must be determined upon the facts of each case, from mixed considerations of logic, common sense, justice, policy, and precedent. See Prosser, Torts, 1941 p. 321 et seq. On precedent and reason, we think that Watts' employment was a concurrent cause of his death, accepting the testimony of Mrs. Garrett as true. There is no practical distinction from the present facts of the Primos and Singer Sewing Machine cases, and the workmen's compensation cases discussed supra and infra.

Appellants say that there must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party, Watts, to the place of his injury, and that the employment must have done more than merely furnish the occasion or opportunity for the assault upon him. 6 Schneider, Workmen's Compensation Law, p. 7. However, this argument does not apply to this case for two reasons. First, this abstract proposition must be related to the facts in each case. Additional factors exist here to connect the employment with the injury. They have been previously outlined in detail. They remove the application of that general principle to the present facts.

In the second place, that proposition, abstractly stated, is not adequate for the application of the purposes of the act to many injuries now properly compensated in most jurisdictions, such as those caused by assaults upon an employee by a third person, as here, and those caused by stray bullets, unexplained falls, objects falling from outside the employee's premises and work, many street risks, for which see Whittemore Bros. Corp. v. DeGrandpre, 1947, 202 Miss. 190, 30 So. (2d) 896, and so-called horseplay cases.

The standard is not whether the employment increased the danger or whether by reason of the employment the workman is more exposed to injury than are others not so engaged. This was the test of the unfortunate and much followed dictum in McNicols' Case, 1913, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306: "The causative danger must be peculiar to the work and not common to the neighborhood." 6 Schneider, Workmen's Compensation Law, pp. 22-26. In practice this restrictive rule was narrower than common law principles of vicarious liability, and resulted in the requirement that unless the injury was of a kind that arose directly out of the nature or peculiarities of the work, no award was possible. The Massachusetts Court, which stated the McNicols' rule, in effect overruled it in favor of a more realistic interpretation in Caswell's Case, 1940, 305 Mass. 500, 26 N. E. (2d) 328, 330. That case involved a situation where an employee was injured when the wall of a brick building in which he was working on the highest floor fell in upon him as the result of an unprecedented tropical storm. In holding that the employee was covered by the act, because he was injured in a place where his work required him to be, the Massachusetts Court laid down the following test, which seems to us to be more consistent with the purposes of a workmen's compensation act: "Unquestionably, the injury was received in the course of his employment. The only other requirement is that the injury be one 'arising out of' his employment. It need not arise out of the nature of the employment. An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects. Thom or Simpson v. Sinclair (1917) A. C. 127, 142, 143."

As indicated in the above quotation, the House of Lords in Thom or Simpson v. Sinclair in 1917 defined the English test similar to that in Caswell's Case. It has been used by many courts in many cases, including

the following: Leonbruno v. Champlain Silk Mills, 1920, 229 N. Y. 470, 128 N. E. 711, 13 A. L. R. 522; Goodyear Aircraft Corp. v. Industrial Comm., 1945, 62 Ariz. 398, 158 P. (2d) 511; Smith v. University of Idaho, 1946, 67 Idaho 22, 170 P. (2d) 404; Spencer v. Chesapeake Paperboard Co., 1946, 186 Md. 522, 47 A. (2d) 385; Dravo Corp. v. Strosnider, 1946, 4 Terry 256, 43 Del. 256, 45 A. (2d) 542; Ruckgaber v. Clark, 1944, 131 Conn. 341, 39 A. (2d) 881; Simmons Nat. Bank v. Brown, 1946, 210 Ark. 311, 195 S. W. (2d) 539; Harvey v. Caddo DeSoto Cotton Oil Co., 1942, 199 La. 720, 6 So. (2d) 747; Mixon v. Kalman, 1945, 133 N. J. L. 113, 42 A. (2d) 309; Brooker v. Thomas Borthwick & Sons (Australasia Ltd.) (1933) A. C. 669, 677, 679, 26 B. W. C. C. 495; Murphy v. Cadzon Coal Co. (Scotland, 1943), S. C. 51-57. For history of development of the rule in Thom v. Sinclair, see 7 N. A. C. C. A. Law Journal 42 (1951); 3 N. A. C. C. A. Law Journal 46-47 (1949). Other cases applying this principle are discussed in other parts of this opinion.

This principle for interpreting the requirement of "arising out of" the employment was recently adopted by the United States Supreme Court for the several Federal workmen's compensation acts in O'Leary v. Brown-Pacific-Maxon Inc., 1951, 340 U. S. 504, 71 S. Ct. 470, 471, 95 L. Ed. 483. An employee of a government contractor on the Island of Guam was swimming near the shoreline in a recreation center provided by the employer. A dangerous channel nearby was forbidden to be used. The deceased employee swam into the channel in an effort to rescue two men crying for help, and was drowned. The Court held: "Workmen's compensation is not confined by common-law conceptions of scope of employment. Cardillo v. Liberty Mutual Ins. Co., 330 U. S. 469, 481, 67 S. Ct. 801, 808, 91 L. Ed. 1028; Matter of Waters v. William J. Taylor Co., 218 N. Y. 248, 251, 112 N. E. 727, 728, L. R. A. 1917A, 347. The test of recovery is not a causal relation between the nature of employment of the injured person and the accident. Thom v. Sinclair,

(1917) A. C. 127, 142. Nor is it necessary that the employee be engaged at the time of the injury in activity of benefit to his employer. All that is required is that the 'obligations or conditions' of employment create the 'zone of special danger' out of which the injury arose. Ibid. A reasonable rescue attempt, like pursuit in aid of an officer making an arrest, may be 'one of the risks of the employment, an incident of the service, foreseeable, if not foreseen, and so covered by the statute.' '' However, the common-law element of foreseeability is not a requirement, as will be later shown.

An affirmance of the award to appellees is consistent with Barry v. Sanders Co., Miss. 1951, 52 So. (2d) 493, where a salesman had completed his day's work, locked his truck, and was proceeding to his room after supper, when he was set upon by two unknown assailants who beat him into unconsciousness and robbed him of his money. It was there held that, where his working hours had terminated and the salesman was engaged in purely and solely personal pursuits, the injury did not arise out of his employment. A finding of the commission to that effect was affirmed. In the present case, Watts was killed during his working hours while engaged in picking up clothing to be cleaned in a place where he was authorized and required to be to perform his job. The Commission has found coverage.

Appellants cite several cases dealing with killings of employees by third persons for reasons of personal jealousy, but we do not think that they should be followed. Most of them do not involve a concurring cause related to the employment such as existed here and has been discussed previously, and they all follow the McNicols' rule, which we here reject. January-Wood Co. v. Schumacher, 1929, 231 Ky. 705, 22 S. W. (2d) 117; Service Mutual Ins. Co. of Texas v. Vaughan, Tex. Civ. App. 1939. 130 S. W. (2d) 392; Shoemaker v. Standard Oil Company of Ohio, 1940, 66 Ohio App. 224, 31 N. E. (2d) 92; Bluegrass Pastureland Dairies v. Meeker, 1937, 268 Ky. 722,

105 S. W. (2d) 611; Ramos v. Taxi Transit Co., 1949, 276 App. Div. 101, 92 N. Y. S. (2d) 744, affirmed in 1950, 301 N. Y. 749, 95 N. E. (2d) 625. The January-Wood and Bluegrass cases both expressly adopt and apply the McNicols' rule. Moreover, they do not consider or apply the incidents, or position and locality rule, which we think is applicable to the present case.

Perhaps the best analysis of the reasons for and meaning of the conditions, obligations and incidents rule, or position and locality rule, is in Hartford Accident and Indemnity Co. v. Cardillo, 1940, 72 App. D. C. 52, 112 F. (2d) 11, 14, certiorari denied, 310 U. S. 649, 60 S. Ct. 1100, 84 L. Ed. 1415, in an opinion by Judge Wiley Rutledge. A co-worker had injured claimant by hitting him because claimant had cursed him in resentment of a nickname which the co-worker had given claimant. The injured worker had cursed his assailant out of personal anger and spite. The assailant hit him out of personal anger and spite. In affirming an award the Court said:

"It is not the peculiar nature of the environment or of the risk, provided it is accidental, but the fact that the work brings the worker within the orbit of whatever dangers the environment affords that is important. It follows also that it is not necessary for the injury or the risk to be 'natural,' 'normal,' or predictable. When it is so, this fact, like 'special danger,' makes causal connection between work and injury more plain. But the very essence of compensation is that the injury be accidental, and that means unexpected. * * *

"The opinion relied specifically upon the New Amsterdam decision in ruling that no more is necessary than that the work subject the employee to a peril which comes from the fact that he is required to be in the place where it strikes when it does so. It is immaterial whether the place is the employer's premises or a street; whether the risk arises from physical features or human agencies connected with the place; whether it is a common oc-

currence or an extraordinary happening; one which threatens only employees at work or others also. * * *

"But resistance to application of the broad and basic principle has been most obstinate perhaps where the particular act immediately causing injury involves responsible volition by the claimant or others. * * * There are two lines of division, which partially overlap. * * * One view limits compensable causation to quarrels relating directly to the work. It disconnects the precipitating incident from the working environment, though that alone may have produced it. So isolated, its immediate relevance to the work becomes the determinative consideration. * * * The other view rejects the test of immediate relevancy of the culminating incident. That is regarded, not as an isolated event, but as part and parcel of the working environment, whether related directly to the job or to something which is a by-product of the association. This view recognizes that work places men under strains and fatigue from human and mechanical impacts, creating frictions which explode in myriads of ways, only some of which are immediately relevant to their tasks. * * * But the explosion point is merely the culmination of the antecedent pressures. That it is not relevant to the immediate task, involves a lapse from duty, or contains an element of volition or illegality does not disconnect it from them nor nullify their causal effect in producing its injurious consequences. Any other view would reintroduce the conceptions of contributory fault, action in the line of duty, nonaccidental character of voluntary conduct, and independent, intervening cause as applied in tort law, which it was the purpose of the statute to discard. * * *

"The limitation, of course, is that the accumulated pressures must be attributable in substantial part to the working environment. This implies that their causal effect shall not be overpowered and nullified by influences originating entirely outside the working relation and not substantially magnified by it. Whether such influences

have annulling effect upon those of the environment ordinarily is the crucial issue. * * * We are committed by the statutes and our previous decisions against the test of immediate relevancy of the precipitating act to the task in hand."

The Court, in Hartford Accident & Indemnity Co. v. Cardillo, was applying the terms of the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. A. Sec. 901 et seq., the pertinent provisions of which are substantially similar to those of the Mississippi Act. We think the reasoning of that decision is sound, is applicable here, and is in accord with the great weight of the better reasoned cases. The area in which the term "arising out of" the employment has given most trouble has been in connection with personal assaults, especially where the employee is injured by an intentional violent assault perpetrated by another. The cases have indulged in endless quibbles about the application of that phrase. As a practical matter, there is little to be gained by asking what are employment risks and what are not. The approach in Hartford Accident & Indemnity Co. v. Cardillo and the other cases discussed in this opinion is we think more consistent with the terms and purposes of the act. The important thing is not the peculiar nature of the environment or of the risk, but the fact that the work brings the worker within the orbit of whatever dangers the environment affords. Watts was placed on the porch with the clothes in his hand by the requirements of his job. His employment subjected him to the peril of a jealous husband with homicidal instincts. He was required to be in the place where the killer struck when he did.

Furthermore, this recognizes that the environment includes associations as well as conditions, and that associations include the faults of human beings as well as their virtues. Men do not discard their personal qualities when they go to work. Nor do neighbors and customers thereby lose certain curiosities and tendencies

to gossip and to suspicion house to house delivery men. In bringing men together, the work brings these qualities together and causes frictions and suspicions between them. Such expressions of human nature are incidents which are inseparable from a job where a man is working with the general public, and in particular where he is calling at homes during hours when the man of the house is usually absent. They involve risks of injury and those risks are inherent in the working environment. These considerations establish a causal relationship within the terms of the act where the position, locality, or situation of the employee is a cooperative or contributory cause of his injury, and personal motives are not the sole and exclusive cause of the injury.

It is well established that assaults which are rooted in the work or which relate to working conditions arise out of the employment. Hegler v. Cannon Mills Co., 1944, 224 N. C. 669, 31 S. E. (2d) 918. And it is also often held that there is no break in the causal relationship between employment and injury where the employee himself struck the first blow. A recent decision to this effect is Dillon's Case, 1949, 324 Mass. 102, 85 N. E. (2d) 69. There is some dispute among the courts as to whether an injured employee who was the aggressor can obtain compensation. But the overwhelming weight of authority holds that when a third party attacks an employee, the intentional nature of the assault upon an employee does not of itself break the chain of causation. In the present case there was an intentional assault upon Watts. In McLean's Case, 1948, 323 Mass. 35, 80 N. E. (2d) 40, 43, a taxi driver was found unconscious and brutally beaten, with the motor and meter running on his cab. Two wallets in his possession containing money were untouched. The claimant's assailant was never identified. In affirming an award of compensation, the Court said that "The question is whether his employment brought him in contact with the risk that in fact caused his injuries," and it thought that it had. It was said that

proof of motive was not necessary. In other words, McLean's Case allowed a taxi driver to recover for a vicious intentional assault by an unknown stranger.

In Entrocut v. Paramount Bakery & Restaurant Co., 1928, 222 App. Div. 844, 226 N. Y. S. 808, a waiter in a restaurant was shot when a revolver being cleaned by a policeman waiting to be served, went off accidentally or negligently. It was held his injury arose out of his employment. A similar result was reached in Greenberg v. Voit, 1929, 250 N. Y. 543, 166 N. E. 318, where a janitor cleaning his employer's front steps was killed by gangsters who passed through the adjacent street shooting indiscriminately from an automobile. Volitional, criminal action was there a peril of the working environment.

In other words, the courts hold that intentional gunshots or accidental ones fired by persons unconnected with the employment of the injured employee, which injure an employee while he is at a place where his work requires him to be, do not break the chain of causation between employment and injury under workmen's compensation acts. These cases apply what for purposes of brevity may be designated as the position and locality test of Thom v. Simpson and other cases. The employment requires the employee to be in what turns out to be a place of danger, and this was a condition and incident of the job.

The same holding is also generally applied as to injuries to employees caused by insane persons, whether the latter are fellow employees or total strangers to the job. An early case of this type granting compensation was Katz v. A. Kadans & Co., 1922, 232 N. Y. 420, 134 N. E. 330, 23 A. L. R. 401, where a chauffeur was driving his employer's car in New York City and an insane man stabbed him. The Court there found it necessary to say that the streets were dangerous places and that the requirements of his job accentuated the chauffeur's risk. However, the courts in such cases soon departed from the

rather artificial requirement that the risk must be peculiar to the job. For example, in Hartford Accident & Indemnity Co. v. Hoage, 1936, 66 App. D. C. 160, 85 F. (2d) 417, 418, the employee was a chef in a restaurant, when a man whom he had never seen before, who did not work for the restaurant and was not a customer, came in the kitchen and stabbed him with a knife. The award was granted under the District of Columbia Workmen's Compensation Law. 33 U. S. C. A. Sec 901 et seq., D. C. Code 1940, Secs. 36-501, 36-502, 33 U. S. C. A. Sec 901 note, which includes a clause similar to that in Section 2(2) of the Mississippi act. The Court held that "the claimant's injury arose out of his employment, because the terms and conditions of his employment placed the claimant in the position wherein he was assaulted by the assailant and sustained the injuries from which he suffered."

In Peraz v. Fred Harvey, Inc., 54 N. M. 339, 224 P. (2d) 524, a housemaid in the employer's hotel was shot and seriously injured by a male fellow servant. The employer produced evidence tending to show that the injury resulted from purely personal motives as a result of a love affair between the servants. It also appeared that the assailant was drunk and the housemaid had previously and forcibly taken a bottle of whiskey away from him. The Court said that the jury could have found that the claimant's injuries resulted from anger by the assailant, or from such extreme intoxication that he did not know what he was doing, and that in the latter case, his acts would fall in the same category as those of an insane person. Under either assumption the Court affirmed the award. In London Guarantee & Accident Co. v. McCoy, 1935, 97 Colo, 13, 45 P. (2d) 900, the employee was stabbed by an insane person unconnected with his salesman's job, and the Court granted compensation for the reason that his job placed the employee where he was when the insane man assaulted him. In Chadwick v. White Provision Co., 1950, 82 Ga. App. 249, 60 S. E. (2d)

551, compensation was granted to an employee killed by an insane fellow servant.

In Asaeda v. Haraguchi, 1947, 37 Hawaii 556, the employee of a painter was sitting in the yard of the home on which he was working, and was eating his lunch, when an insane man ran amok and injured the employee by hitting him on the head with an iron pipe. The Hawaii act contained a provision similar to Sec. 2(2) of the Mississippi act. Compensation was granted, and the court examined in some detail many of the leading cases discussed above. The Court said: "* * * an injury arises out of the employment if the work brings the worker into a place of danger, whether the danger arises from physical conditions or from human agencies connected with the place; that it is not necessary that the danger be foreseen or expected. * * *" Christiansen v. Hill Reproduction Co., 1941, 262 App. Div. 379, 29 N. Y. S. (2d) 24.

These cases granting awards where employees are injured by insane persons are based upon the position and locality test, that the work places the worker in the place where he was injured. Perhaps one of the best discussions of this rule is in Louie v. Bamboo Gardens, 1947, 67 Idaho 469, 185 P. (2d) 712, 720, where a dishwasher was shot by an insane man unconnected with the job and not a customer, and compensation was granted. The Court said that "It was his employment that placed him in the position and environment wherein he was assaulted and sustained the accidental injury."

In Cole v. I. Lewis Cigar Mfg. Co., N. J. 1948, 63 A. (2d) 293 a night watchman was murdered while on watch at the employer's plant. No property of the employer was taken but some money was taken from the employee. Nevertheless, the Court held that the employee's death arose out of his employment. See also Jefferson Ice Co. v. Industrial Comm., 1949, 404 Ill. 290, 88 N. E. (2d) 837; Riedel v. Havemeyer, 1950, 277 App. Div. 957, 99 N. Y. S. (2d) 628. In Casualty Reciprocal

Exchange v. Johnson, 5 Cir., 1945, 148 F. (2d) 228, an engineer about to take a drink of water on a platform was assaulted by an unknown party, and an award was granted. In McKiney v. Reynolds & Manley Lumber Co., 1929, 79 Ga. App. 826, 54 S. E. (2d) 471, the employee was a laborer in the employer's lumber yard when he was struck and killed by lightning. An award was granted for the reason that he was injured at a place where his job required him to be.

In Huston v. Industrial Commission of Ohio, 1949, 87 Ohio App. 33, 85 N. E. (2d) 531, the assistant manager of a taxicab company was taking his lunch in a cafe when bandits held it up. The employee struck at a bandit and was killed. It was held that his death arose out of his employment. The personal attempt to obstruct the bandit did not break the chain of causation between employment and injury.

In American General Ins. Co. v. Williams, Tex. Civ. App. 1949, 222 S. W. (2d) 907, the injured employee was killed in an argument resulting from a crap game which occurred at the place of employment of the construction company, but before the employee had started actual work. There was some evidence that the dice game was known and permitted by the employer. The Texas Court cited with approval Hartford Accident & Indemnity Co. v. Cardillo, supra, and held that the crap game had become a part of the employee's working environment and arose out of his employment. The evidence indicated that deceased had refused to pay a bet which he had lost. In Beh v. Breeze Corp., 1948, 137 N. J. L. 431, 60 A. (2d) 273, a hitchhiker killed the salesman-driver who gave him a lift. The death arose out of his employment. In Giracelli v. Franklin Cleaners & Dyers, 1945, 132 N. J. L. 590, 42 A. (2d) 3, an award was allowed where a customer raped an employee sales-clerk.

The incidents or position and locality test was first applied in Thom v. Sinclair, A. C. 127 (1917). There a woman employed as a fish-curer, while working in a

shed belonging to her employer, was injured by the fall of a wall which was being built on the property of an adjoining owner. The House of Lords there held that her injury arose out of her employment because "her service there and not anywhere else brought her into the position of being subjected to this peril"; that the expression "arising out of the employment" applies "to the employment as such—to its nature, its conditions, its obligations, and its incidents." The cases discussed above indicate a general practice today to apply that position and locality test. Perhaps the most thorough recent discussion of it was in Industrial Indemnity Co. v. Industrial Accident Commission, 1950, 95 Cal. App. (2d) 804, 214 P. (2d) 41, 46, where a wife of a customer of a bar entered the bar, and shot at her husband, missed him, and the bullet ricocheted off the bar and struck a waitress in her back, killing her. In affirming an award of compensation, the court discussed in detail the position and locality test and held that the employee's death "arose out of her employment because her employment required her to be in what turned out to be a place of danger." See also Pacific Indemnity Co. v. Industrial Accident Comm., 1948, 86 Cal. App. (2d) 726, 195 P. (2d) 919.

In State Employees' Retirement System v. Industrial Accident Comm., 1950, 97 Cal. App. (2d) 380, 21 P. (2d) 992, the deceased employee, Lund, was a fish and game warden. He had no regular or fixed hours, and he frequently did patrol duty at night. On the night of his death, he went on patrol. His car had in it a bed on which he was authorized to sleep when he would be on night patrol. Lund did not report the next morning, and he was found dead lying on the bed in his car with a deceased woman, both of whom were clad only in underwear. The ignition switch and heater were turned on, the windows were closed, and death was attributed to carbon monoxide poisoning. Lund had stationed himself in a territory which was under surveillance for

the illegal spotlight killing of deer. The Court affirmed a commission holding that his death arose out of the employment. Lund was required to drive to isolated spots, he was authorized to sleep on the bed in his car, and the fact that there was a woman in the car with him did not require a conclusion that Lund had abandoned his employment.

The position or locality test was also applied in Ferguson v. Cady-McFarland Gravel Co., 1924, 156 La. 871, 101 So. 248, 249, where the deceased was working at a gravel plant, and while in a stooping position, a fellow employee struck him on the head with a shovel. The fellow employee was not insane, and the Court assumed that personal motives were the cause of the blow. The Court granted compensation and held: ''An employee, like the decedent, who may have an enemy among his fellow employees in the same gang in which he is required to work, necessarily comes in contact with such enemy throughout all hours of the day, and is constantly exposed to assault and bodily harm. He therefore incurs greater risk necessitated by his employment than a person ordinarily would be subjected to outside of such employment.''

In Keyhea v. Woodward-Walker Lumber Co., La. App. 1933, 147 So. 830, Keyhea, an employee of the lumber company, was shot by a section foreman of the company while riding back from the mill on the company's locomotive. Deceased was unarmed, and unsuspecting. The killer was standing on the ground. There was evidence that deceased's wife was having a love-affair with the killer and that the cause of the shooting was jealousy. The court granted an award of compensation, and held that the employment increased the danger by throwing the enemies together and that it placed the deceased where he was when he was shot.

In summation, the position and locality test has a sound historical basis in workmen's compensation law. It also has a firm foundation in the purposes and policy

of compensation acts. It has been applied by many courts in cases involving work assaults, assaults upon employees by third persons unconnected with the job, assaults by insane and drunk persons unconnected with the job, and wilful assaults by third persons unconnected with the job where the employee's job required him to be in what turned out to be a place of danger. This is held to be a condition and incident of the employment. We are of the opinion that these principles are applicable here, even more strongly than in some of the cases discussed above. In the present case, not only did Watts' employment place him on the porch at the time he was shot, but it is undisputed that the assailant was a regular customer of appellant and obtained Watts' presence in part at least for the purpose of Watts picking up the clothes to be cleaned by appellant, employer, and that immediately before he was shot he had the clothes in his hand for that purpose. Under these authorities we are unwilling to say that the hearing examiner had no substantial evidence upon which he could find that Watts' injury arose out of his employment. On the contrary, under these facts, we think that it is manifest that it did arise out of his employment. The mere fact that possibly personal motives were some of the motivating factors did not break the chain of causation between employment and injury where factors related to the employment existed.

There is another important factor which further confirms the above reasons why the award of compensation must be affirmed. This opinion has been written on the assumption that Mrs. Garrett's testimony was true. However, it is apparent that the trial examiner did not accept as true her testimony concerning an alleged affair with Watts, and we think that there are sufficient evidence and circumstances reflected in the record to warrant the examiner in refusing to accept her story. At the time of the trial Mrs. Garrett was living with her husband. He had never been indicted for the killing of

Watts. The examiner, who saw the witness, found that Mrs. Garrett had every reason to describe the situation and the reasons for the shooting as she did, since it manifestly was to her interest to protect her husband from criminal prosecution. In the second place, the examiner also found that the testimony of the witnesses which appellants claim is corroborative of Mrs. Garrett's testimony, Miss Edwards, Jones and Wilson, was of little weight, and here again he saw them and was in a better position than is this Court to judge their accuracy and trustworthiness. Moreover, the record reflects, and the examiner found, that their testimony is of very little probative value in corroborating the story of Mrs. Garrett. It was largely hearsay, gossip and suspicion. If their testimony is of no value, then the only evidence in the record about the alleged love affiair was that of Mrs. Garrett. In the third place, and most materially, the examiner manifestly believed the testimony of C. B. Ferguson, City Marshal of Crystal Springs, who testified that about 5 to 10 minutes after the shooting, Mrs. Garrett told neighbors who were bystanders, ''I hope all you neighbors are satisfied. All this talk you been doing that you don't know anything about has caused an innocent man to get shot.'' Assuming Mrs. Garrett made this statement, especially under these circumstances, it has considerable probative value on the veracity of her entire story. It tends to remove the entire foundation thereof. With these three considerations in mind, we think that the hearing examiner was warranted in not accepting the testimony of Mrs. Garrett about the alleged love affair between her and Watts.

Under those circumstances, there is no testimony at all in the record to indicate the reason why Garrett shot Watts. If he was insane or drunk or otherwise demented, the above discussed authorities would universally hold that Watts' death arose out of his employment. There is no evidence which indicates that Garrett was insane or intoxicated. However, a showing of the reason why

Garrett shot Watts is not a sine qua non of recovery. The material question is not what were Garrett's motives, an indefinite and unrealistic criterion at best, but whether Watts' employment in fact was a material factor in placing him on the porch at the time he was shot and thus was a connecting link with his injury. Watts' job placed him on the porch of a regular customer of appellant at the time of his death with clothing in his possession to be cleaned, doing an act for the benefit of his employer. Under these authorities the examiner was warranted in finding that his death arose out of his employment. In many of the cases discussed above, the motive was not known, yet the facts permitted an inference that the injury arose out of the employment. For example, in McLean's Case, 1948, 323 Mass. 35, 80 N. E. (2d) 40, a taxi driver was found severely injured in his cab with the motor and meter running, and no money had been taken from him. In affirming an award the Court said that ''the employee's case does not stand or fall on establishing robbery as a motive.'' Motive is sometimes material where entirely personal motives cause the assault, but under the facts there the court thought that the Commission was warranted in finding the necessary causal relation between employment and injury. In the present case, where Mrs. Garrett's testimony is not accepted by the hearing examiner, there is no evidence whatever of any solely personal purpose. The other facts in the record constituted substantial evidence to support the finding that Watts' death arose out of his employment.

Affirmed.

PER CURIAM.

The above opinion is adopted as the opinion of the Court, and for the reasons therein indicated, the judgment of the court below is affirmed.

**Roberds, J.,** (dissenting).

These compensation cases are compelling the Court to abandon, to a large extent, the fundamental rules of law which have been established through the centuries for determination of human rights between men. They have been a lamp unto our feet, and, for my part, I shall forsake them only as required by a validly enacted constitutional statute. However, in my view, the applicable principles, even under the Compensation Act, do not justify the conclusion reached in the majority opinion under the facts of this case. To say the least we have adopted the most extreme, or liberal, views of the courts of the country dealing with the questions.

In order to impose liability on an employer for damages the injury or death must arise "out of and in the course of employment, and includes * * * an injury caused by the wilful act of a third person directed against an employee because of his employment, while so employed and working on the job." Ch. 354, Sec. 2(2), Laws of Miss. 1948, and Ch. 412, Sec. 2(2), Laws of 1950.

I will first consider the effect of the first requirement as applied to the facts of this case. What is the test of liability under this provision? Schneider, often cited in the majority opinion, states the rule in these words: "As has already been indicated, it has been held quite uniformly that an injury arises out of the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury". Again "proximate cause may be defined as that force or cause which is primarily responsible for the disability which directly or indirectly flows from its acts or occurrences". Further, "The fact that one is working at the time he is injured, and would not have suffered injury had he not been employed, does not show a causal connection between the employment and the injury, nor will a showing that the employment brought the party to the place where injured and that he

would not have met with the accident elsewhere show a proximate causal relation between the employment and the injury". "The risk must be reasonably incidental to the employment * * * There must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury". Schneider, Vol. 6, pages 7, 32 and 33.

In Schwartz v. Industrial Commission, 379 Ill. 139, 39 N. E. (2d) 980, 983, the court said: "A prerequisite to the right to compensation is that the accidental injury must arise out of, as well as occur, in the course of the employment, and the mere fact that the duties take the employee to the place of the injury and that, but for the employment, he would not have been there, is not, of itself, sufficient to give rise to the right to compensation. There must be some causal relation between the employment and the injury and the causative danger must be peculiar to the work and not common to the neighborhood". A hundred cases might be cited in support of the foregoing propositions.

Now as to the facts: Watts' working for the laundry simply afforded him an opportunity to meet and fulfill his rendezvous with Mrs. Garrett. The same opportunity, and a better one, would have existed had he been a paper hanger or a plumber working at the Garrett home, or a postman passing that way, or had Watts not been employed at all. There was no causal connection between his working for the laundry and being killed because of the illicit relations. The facts bring the case squarely within the stated rule that "* * * the mere fact that the duties take the employee to the place of injury and that, but for the employment, he would not have been there, is not of itself sufficient to give rise to the right of compensation".

Did Garrett kill Watts because of his employment by the laundry? "Where the moving cause of an assault by a third party upon the employee is personal, or the

circumstances surrounding the assault furnishes no basis for a reasonable inference that the attack was made because of the employment, compensation is denied''. 6 Schneider, p. 199, citing McConnell v. Lancaster Bros., 163 Tenn. 194, 42 S. W. (2d) 206. "It is not sufficient that the employment be an incident of the assault, such as the cause of one being at the place of the assault. Neither is it sufficient that the employment be an incident of the cause of the assault * * *. It must be the main cause of the assault to be compensable.'' "In other words, the assaulted employee must have been set upon by his assailant because he was an employee, or because of his employment, and not for some reason personal to the employee as an individual * * *.'' Schneider, supra, pp. 119, 199 and 200. There is not the slightest evidence in this record to support the conclusion that Garrett killed Watts because he was working for the laundry. Garrett had nothing against the laundry. Indeed he was its patron. He would have killed Watts just as quickly had he been a farmer, a merchant or a candlestick maker. He killed the man who was having relations with his wife—a tragedy which has been enacted a million times in the past and will be enacted a million more in the future. Whether Watts was employed or unemployed had nothing in the world to do with the act. As soon as Garrett was sure, from hearing the conversation between his wife and Watts that Watts was the guilty man, he killed him. He killed the man—not the laundryman.

Barry v. Sanders Co., Miss., 52 So. (2d) 493, was a much stronger case in favor of claimant than is the case at bar. In that case Barry was employed by Sanders as a door-to-door salesman on a commission basis, and, as a part of the agency agreement, was furnished by the employer a truck in which he carried the supplies and merchandise for delivery upon sale. About nine o'clock at night Barry had parked the truck at the Magnolia Inn, and had gone to his room in that Inn.

He heard an outside noise as if someone were trying to break into the truck. He went out to the truck but finding no one there got into the vehicle and rode around in an effort to detect and identify the would-be intruder. Being unable to do that he proceeded to go to a restaurant for a meal. Upon his return to the Inn he was set upon by unknown assailants, beaten into unconsciousness and robbed of fifty-five dollars. The Commission, the lower court and this Court held Barry not entitled to compensation. The inference that the assault upon Barry was because of his employment, his assailants likely reasoning he had money upon his person resulting from that employment, was much stronger than any possible inference in this case that Garrett shot Watts because Watts was working for the laundry.

The majority opinion seemingly refused to accept as a fact that such relation existed between Watts and Mrs. Garrett. That would seem a rather desperate conclusion under the evidence here. It is undisputed that Watts had been in the habit, in the absence of Garrett, of parking his truck in front of, or near, the Garrett home and remaining in the home with Mrs. Garrett alone from thirty to forty minutes on the days he received from her the signal that the husband was not at home and the way was clear; one of the neighbors caught them in a compromising position; just prior to the shooting, Garrett heard Mrs. Garrett explaining to Watts why she could not then keep her tryst, and arranging for a future meeting. Mrs. Garrett testified under oath that the relation did exist; and, most conclusive of all, perhaps, was the undisputed fact that immediately after Watts was shot Mrs. Garrett, in the presence of her husband and others assembled there, spontaneously gathered Watts' head into her lap and tried to comfort him as his soul was wafted to the Great Beyond, at the same time bitterly denouncing those she considered responsible for his death. And the fact that Garrett has never been indicted and tried for the homicide can be explained

only upon the assumption the killing was because Watts was breaking up the Garrett home. There is no pretense in this record of any other reason for the shooting. How, then, can it be said the relation did not exist?

But, from a legal standpoint, it matters not whether such relation existed in fact or whether Garrett merely believed it was a fact. He killed Watts either because it was a fact and he believed it or he believed it and it was not a fact. In either case he did not shoot Watts because he was connected with the laundry. The employment had no bearing whatever in causing the act.

The majority opinion invokes the danger zone theory, and cites the opinion by Judge Rutledge in Hartford Accident & Indemnity Co. v. Cardillo, 72 App. D. C. 52, 112 F. (2d) 11. The case is not, or should not be, applicable here. The case is illustrative of an extreme view, and Schneider says "* * * these holdings represent and express a minority view not generally followed". 6 Schneider p. 155. But the facts of that case are totally different from the facts of the case at bar. In that case Bridges, the claimant, was employed as a helper in a produce warehouse, along with other employees, and was engaged in loading vegetables onto his employer's truck, under the direction of Roy Downey, a supervisor of the labor. Downey addressed Bridges as "Shorty", and Bridges, in turn, called Downey a vile name, whereupon Downey struck Bridges. There may be some slight excuse for holding the employer liable in that case, since the place where Bridges was working brought him into close relationship with the other employees, each with his own personal traits, character, habits, disposition, and the fact that Downey was the aggressor and the injury to Bridges was the result of an attack by his immediate superior, and both were servants of the same master, although the conclusion is rather far-fetched. But the case has no application to the facts of the case at bar. The route over which Watts was picking up clothing was in no wise a danger zone—certainly,

not in the sense there was danger that one so working would become intimate with the wife of some customer and the husband would take his life. Had Watts been bitten by a vicious watchdog the danger zone theory might have had some application. That might be a risk incident to the employment, since it is generally known many people have such dogs about their homes. But what employer could anticipate an employee would bring about the situation here as an incident of the employment? All the cases allowing compensation under the danger zone theory stress the extraordinary and unusual apparent danger inherent in the discharge by the employee of his required duties, and that the claimant is the victim, not the participant. In the case at bar the zone was not dangerous. Whatever danger existed was produced by Watts himself. He was the danger zone.

To hold the laundry here liable in damages for the death of Watts is, in my humble opinion, a grave injustice, and the holding will plague us in the future.

**Alexander, J.** (dissenting).

No one would begrudge to the dependents of a deceased employee the right to a liberal construction of our Workmen's Compensation Law, with a view to granting every protection to those who have by such law been accorded a measure of security and compensation which had been too long denied. Yet, the law itself must be protected against the warping influences which would, by distorting its plain language, amend it by judicial fiat.

I concur in the views of Justice Roberds that death from a wilful assault by a third person is compensable only when it is committed because of the employment of the deceased. A causal, and not an incidental, connection is required. "Because" does not mean "while". The circumstance that an employee is injured while employed is taken care of in the provision that the injury must arise out of and in the course of the employment.

Yet, as to a wilful act of a third person, it must arise "while so employed and working on the job", not only, but also "because of his employment." There is no redundancy here; the two concepts are entirely distinct, and the use of both expressions points up their different meanings.

It would seem that realism had been abandoned, when we reject or doubt the fact that the homicide was caused by the resentment of a vengeful and outraged husband. To make some other theory acceptable, it has been argued that a wife's testimony to her own unfaithfulness is not worthy of belief. It seems to be overlooked that the basis of her incredibility is thus made her accepted status as an adulteress, which is the very fact that is being rejected as coming from a witness unworthy of belief. By like reason, no confession of guilt should be given weight since a person who would steal would lie.

Certainly no presumptions of rightful conduct have any place, for if the wife is to be presumed to have been loyal to her husband, the result is a conclusion of guilt of perjury. Such presumption further results in a conclusion that the husband is guilty of a deliberate and unjustified murder. Yet, he also would be equally entitled to protection behind the shield of presumed lawful conduct.

This case furnishes no occasion to try the issue of the husband's guilt, nor indeed the guilt of Watts. As intimated by Justice Roberds, it is enough that Garrett believed him to have despoiled his home. No one should be unrealistic enough to disregard all the testimony in order to attain a conclusion that Garrett was merely testing his markmanship upon the most available human target.

In this connection, we have overridden the view definitely expressed by us in construing this law that: "Uncontradicted or undisputed evidence should ordinarily be taken as true by the triers of the facts. More precisely, evidence which is not contradicted by positive testimony or circumstances, and is not inherently improb-

bable, incredible, or unreasonable, cannot be arbitrarily or capriciously, discredited, disregarded, or rejected, even though the witness is a party or interested; and unless shown to be untrustworthy, is to be taken as conclusive, and binding on the triers of fact." Lucedale Veneer Company v. Rogers, Miss., 53 So. (2d) 69, 75.

It is immaterial, as a mere incident, that Watts was killed while in actual possession of clothing to be cleaned, or that he was at the established rendezvous. There is no need to corroborate the fact that he was engaged in collecting laundry. We have seen fit to doubt only the fact of the rendezvous. In principle, the situation is the same whether he was killed in the home which had been unlawfully invaded or whether he had been waylaid while upon his appointed rounds. Also immaterial is the fact that he was killed by Garrett or an outsider. The important inquiry is: was he killed because he was so employed? Concede the absence of any misconduct on the part of Watts—as the controlling opinion assumes—this does not bring into view, as the only alternative, that he was killed because he was a laundryman. Had he been assaulted or killed as a result of some labor dispute during a controversy between striking employees, an illustration of causal connection would become evident.

Without prolonging futile dissent, it is worthy of repeated underscoring that injuries to an employee are never compensable unless suffered while he is in the course of his employment. Barry v. Sanders Company, Miss., 52 So. (2d) 493. Yet, in cases of accident it must arise out of and in the course of his employment. But in those cases where there is a wilful act of a third person, the injury or death must occur not only "while so employed and working on the job" but "because of his employment". Such instances here are not within a foreseeable zone of danger incident to the work. I am not prepared to accept the view that the probability of an employee's detour from his established course into

the bedroom of an unfaithful spouse is so great and so generally accepted that an employer must assume the risk of resentment by an outraged husband on the theory that such deviation is usual, normal and foreseeable. It would seem to be more reasonable to impose liability upon an employer in cases where the employee diviates from his course to rob a bank and who is killed by a police officer, in a zone of danger which was of his own creation. Here, Watts was not killed because of his employment but because of his deviation. I take occasion to repeat that it matters not whether Watts was in fact guilty or the deviation existed in fact. That is why he was killed.

Even if it be conceded that Watts was at the home because of his employment, it does not follow that he was killed because of this employment. Such cases as Primos v. Gulfport Laundry and Cleaning Company, 157 Miss. 770, 128 So. 507 and Singer Sewing Machine Company v. Stockton, 171 Miss. 209, 157 So. 366, ought to be readily distinguishable. In both cases the fact that injury was caused by a servant while in the course of his employment was sufficient to impose liability respondeat superior. In the instant case this doctrine is not involved. Watts injured no one while so employed; he was the person injured. There was no interweaving of personal and business purposes, as existed in Richberger v. American Express Company, 73 Miss. 161, 18 So. 922, 31 L. R. A. 390; Barmore v. Vicksburg, S. & P. R. Co., 85 Miss. 426, 38 So. 210, 70 L. R. A. 627, or in Lundell v. Walker, 204 Ark. 871, 165 S. W. (2d) 600, cited in the controlling opinion. There was no dispute between Garrett and Watts over business of the laundry. The homicide was committed while Watts retained the status of an employee, yet, as in Barry v. Sanders Company, supra, not because of the employment.

The controlling opinion accepts the finding of the hearing examiner that "there is nothing other than conjecture to show that Garrett suspected Watts or

anyone else as the guilty party or that the shooting actually arose out of an affair between the two. It is thereupon concluded that there was no testimony as to motive. Such finding may be justified only if we strike from the record all the testimony of Mrs. Garrett except such as is favorable to the appellee, and all other circumstantial evidence, including Garrett's bitter triumphant cry "Well, I caught y'all", and reject all deduction which a jury would be privileged, and likely, to make as to why Watts was killed. Reasonable deduction should not so readily be cast aside by calling it conjecture.

I readily subscribe to the oft expressed view that this law must be given a liberal interpretation in the interest of injured employees. However, this principle applies only to doubtful or ambiguous provisions. Here, our Court has given to the expression "liberal interpretation" a liberal interpretation.

McGehee, C. J. (separate opinion).

In this case my conclusion as to whether the judgment appealed from should be affirmed or reversed does not affect the ultimate result, since there were sufficient votes for an affirmance cast in the conference prior to the absence (on account of illness) of Mr. Justice Hall. Although I am not in accord with some of the findings of fact made by the Workmen's Compensation Commission, which were affirmed by the circuit court, and do not think that the Court should go as far as some of the decisions cited in the controlling opinion have gone on the question here involved, I am not prepared to say that the conclusion reached in this case is contrary to many of the decisions cited from such other jurisdiction, giving an exceedingly liberal interpretation to Workmen Compensation Acts.

Nevertheless, I cannot refrain from stating that I am greatly impressed with much of the reasoning contained in the dissenting opinions of Justices Alexander and Roberds in this case.

However, I do think the fact that the laundryman had picked up the suit of clothes of his slayer to be carried to the laundry is material at least to the extent of showing that he was about the duties of his employment on the occasion that he came to his death. I think that this fact enabled the slayer to identify him as the laundryman, but I am inclined to the view that we may be going too far in holding that the laundryman was killed because of his employment. The slayer intended to kill the laundryman, but it seems to me that he intended to do so because of the admittedly illicit relationship between the wife of the slayer and the laundryman, rather than because of the latter's employment by the laundry. or because of the performance of any of his work or in connection with any of his duties under such employment. I doubt that we may correctly classify as an industrial hazard an injury to an employee that he receives by reason of becoming too intimate with the wife of a customer of the employer. The danger zone here appears to have been created by the misbehavior of the employee, which an employer would not normally be required to anticipate or insure against.

But as hereinbefore indicated, I dislike to dissent from a controlling opinion without having studied the decisions upon which such opinion is based as thoroughly as the author thereof has evidently done in the instant case; and since my vote would not change the result, I do not feel justified in delaying the decision any longer for the purpose of a further consideration of the decisions cited from other jurisdictions which tend to support the judgment appealed from. Otherwise, I would feel constrained to do so. At any rate, and for the foregoing reasons, I do not dissent.

The final opinion was as follows:

**Kyle, J.**

This case was submitted on October 1, 1951, and an opinion was rendered by the Court, affirming the judg-

ment of the lower court on November 26, 1951. After the filing of that opinion the appellants filed a suggestion of error, in which the appellants challenged the correctness of the opinion of the Court on three main grounds: (1) That the Court erred in holding that the provisions of Section 2(2) of the Mississippi Workmen's Compensation Act, Ch. 354, Laws 1948, do not require that in a case of injury or death caused by the willful act of a third person, such act must have been directed against the employee because of his employment in order for compensation to be allowed, and (2) that the Court erred in holding that the death of Charles Watts arose out of his employment, within the meaning of the Mississippi Workmen's Compensation Act, and (3) that the Court erred in holding that Charles Watts' employment was a substantial contributing cause of his death. After the briefs filed in support of the above mentioned suggestion of error had been considered by the Court, a memorandum request was made by the Court for reply briefs from the attorneys for the appellees. Reply briefs were filed on May 1, 1952, and the case has again been considered by the Court in banc with all of the Judges participating, and a majority of the Judges are of the opinion that the suggestion of error should be sustained, and that the original opinion rendered by the Court on November 26, 1951, should be withdrawn and the judgment entered by the Court on that date affirming the judgment of the lower court set aside, and the judgment of the lower court affirming the order of the Compensation Commission allowing the claim should be reversed and judgment entered here for the appellants.

The facts disclosed by the record, as summarized in the original opinion, are substantially as follows:

Appellees, Katherine L. Watts and Ronny Watts, are the wife and minor son of Charles Watts, who was shot and killed by a customer of the appellant, Brookhaven Steam Laundry. The other appellant is the insurance carrier, Utica Mutual Insurance Company. Appellees

were granted an award of compensation under the Mississippi Workmen's Compensation Act Miss. Laws 1948, Chap. 354, amended by the Laws of 1950, Chap. 412 (only the 1948 Act is applicable here). The order of the hearing examiner was affirmed by the Workmen's Compensation Commission and by the Circuit Court of Copiah County. The question is whether there is sufficient evidence to support the finding of the hearing examiner that the death of Charles Watts, resulting from this assault upon him, arose out of his employment and was "because of his employment" within the terms of the statute.

Charles Watts, the deceased, was employed by the Brookhaven Steam Laundry as a route man. His duties were to pick up and deliver laundry and dry-cleaning for the employer. He worked on a commission basis, and was encouraged to obtain additional customers within the territory assigned to him. Crystal Springs was designated by his employer as one of the towns in his territory. The employer also designated Tuesdays and Fridays of each week as the days on which Watts would call on customers of the laundry in Crystal Springs. The truck which he used for his job and all of the expenses of its operation were furnished by the employer. Watts had been working for the laundry for about two years prior to his death. The laundry had on its books a regular customer in Crystal Springs by the name of Henry Garrett.

There were only three witnesses to the shooting who knew anything of its precedent circumstances. They were Henry Garrett, who did not testify and who was not offered by either side; Charles Watts, the deceased; and Mrs. Henry Garrett. Mrs. Garrett testified that she first met Charles Watts sometime in September, 1948. The Garretts were living in a house on Lee Avenue in Crystal Springs. Lee Avenue runs east and west and the house is on the north side of the street facing south. It had a small porch on the front. The living room door,

with a screen door on it, faced south, and to the right as one goes up the front steps is a bedroom door, which entrance at the time of the shooting also had a screen door. The bedroom door faced west. The two doors were within a few feet of each other, and each screen opened toward the other door.

Mr. Garrett worked in Jackson and left his home about five o'clock A. M., returning around 4:30 P. M. Mrs. Garrett, who worked in a shirt factory in Crystal Springs, was temporarily laid off from work because of a fire in September, 1948. Before that she had been leaving their laundry and dry cleaning with the next door neighbor for appellant laundry to pick up. She testified that, after she was temporarily out of a job, Watts called at their house for the laundry, and that after several meetings she and Watts began to have a love affair and regular sexual intercourse; that Watts would come to her house on Tuesdays and Fridays, the regular days for his work in Crystal Springs, for 30 to 45 minutes during the noon lunch-hour, and that after she went back to work, she would come home for lunch for the purpose of meeting him; that the Garretts regularly traded with appellant laundry, and that Watts oftentimes would pick up and deliver laundry or dry cleaning on those occasions; and that on other occasions, he would visit with her for personal purposes without picking up or delivering any clothing. She said that she and Watts had an arrangement by which clothing to be cleaned would be placed on a chair on the porch as a signal to Watts that he could come in the house. Apparently in most instances the clothing was also put out for him to pick up and have cleaned and pressed.

Watts had at least one other customer in the immediate neighborhood, the Jones, who lived next door to the east of the Garrett house. On most occasions, when Watts would call he would leave his laundry truck in front of the Garrett house, and at other times partly between the Garretts' and the Jones' houses. On the day of the

shooting of Watts, April 19, 1949, Mrs. Garrett returned from work to her house around 12:10 P. M. She placed a suit of her husband on the chair on the porch, and she said that this was a signal that Watts could stop and come in the house. She also stated that her husband had previously ''told me to have it cleaned and I put the suit out''. She ''meant for him to carry them away with him.''

Watts arrived at the house later than usual, at about 12:30 P. M., went up on the porch and talked to Mrs. Garrett for about fifteen minutes. She told him not to come in because she was late and had to get back to work. During this period Watts was standing on the porch with the screen door to the living room held open, the wooden door being open also. Mrs. Garrett was standing just inside the living room door. She did not remember when Watts picked up the clothing which was to be cleaned, but she said that he had them in his hand for some time while they were talking. She did not know that Garrett, the husband, was in the house. She thought he had gone to work that morning. She and Watts were talking in a normal tone, and she thought her husband could have heard their conversation. Garrett suddenly opened the wooden door to the bedroom. She said that she and Watts had been talking about future meetings between them. When Garrett appeared Watts had the suit of clothes of her husband in his hand. Garrett had a pistol in his hand, which was apparent to both Mrs. Garrett and Watts when he opened the door. She said that Garrett said, ''Well, I caught y'all,'' and that he told Watts to get away from the house and stay away. She then testified as follows: ''Q. What did Mr. Watts do, if anything? A. When Henry spoke we both whirled out of the door and Charles grabbed the door that went into the bedroom—the screen door—and he pulled it open and threw the clothes down. Henry stepped back in the room and asked him to stop and step backwards. When I seen what Charles was going to do, I grabbed

for him and Charles said 'Fella, I'll * * *' and he never did finish the sentence. Henry shot him. And when I grabbed him that finger there—the bullet hit the nail on it. Q. The finger of your left hand? A. Yes, sir."

Watts threw the clothing just on the inside of the bedroom door. After Watts fell Mrs. Garrett sat on the edge of the porch with her feet on the first step and held his head in her lap until the ambulance arrived. One of his feet was in the door of the bedroom with the screen door against it. He died shortly after the shooting.

C. B. Ferguson, City Marshal of Crystal Springs, testified that he arrived 5-10 minutes after the shooting and, speaking of Mrs. Garrett, Ferguson said: "Just a few minutes after I had gotten there and the neighbors began to gang around she said 'I hope all you neighbors are satisfied. All this talk you been doing that you don't know anything about has caused an innocent man to get shot.' "

Mrs. Garrett denied making this statement, but stated that she told the neighbors who had gathered around that she knew they had been talking and she hoped that now they were satisfied.

The examiner found in effect that Garrett did not know Watts personally, and that Garrett had no actual knowledge of the affair and did not suspect Watts individually. Concerning this Mrs. Garrett testified: "Q. He didn't know Watts, did he? A. I don't know whether he did or not. Q. He didn't know who the man was talking to you—correct? A. I don't know what he knew."

After Garrett had opened the bedroom door, Mrs. Garrett manifestly thought that it was apparent that her husband was going to shoot Watts. Speaking of Watts, she said: "A. I was right there with him. I was kind of in hopes to keep him back after I seen what was going to happen. Q. Your husband was armed with a pistol? A. I saw the pistol when he jerked open the door."

The District Attorney and some police officers, offered by appellees, testified as to an oral and a written state-

ment made by Garrett after the shooting. This was excluded by the hearing examiner, and since appellees took no cross-appeal thereon, we do not consider those statements or the question of their admissibility. It was shown that Garrett had not been indicted by two succeeding grand juries. The hearing examiner found that the testimony of H. B. Goolsby, who said he actually saw the shooting, "sheds no light upon the details or circumstances surrounding same", and that the testimony of Miss Edwards and of Jones and Wilson, neighbors of the Garretts, was of little weight. Neither Jones nor Wilson, who lived on opposite sides of the Garrett home, had ever seen Watts enter the Garrett house. Miss Edwards said she had.

The hearing examiner found that Mrs. Garrett was an admitted adulteress and that "whether the controversy * * * grew out of domestic matters is a matter only Mr. Garrett can clarify in as much as Mr. Watts is dead"; that there is a presumption of morality which should be recognized until a preponderance of evidence shows otherwise; that "only by the testimony of suspecting neighbors, whose evidence was largely their opinions, and the admission of Mrs. Garrett, who has little to lose and everything to gain by justifying her husband's act as reason for the shooting, has a reason for the shooting been offered." The examiner found that there was nothing unusual in parking the delivery truck near the Garrett home as it was also shown that Watts collected laundry from others in the neighbzorhood in addition to the Garrett family; that assuming that an affair did exist between Watts and Mrs. Garrett, the record did not show that Garrett had actual knowledge of the affair or that Garrett suspected Watts as the transgressor; that Watts was on the porch on a regular day and had the clothes for the laundry in his hand; that Mrs. Garrett did not think her husband even knew Watts; that assuming Garrett went to the door to warn Watts or any other man away from the house, "such a presumption,

if true, would have led to the shooting of any other party present regardless of his innocence.'' The examiner thought that even though some personal motive may have made Watts' business trips more interesting, Watts was still at the time in the process of picking up laundry when shot; that Watts would not have met with the fatal accident if he had not appeared at the Garrett home on the laundry's business that day. Hence, the examiner found that ''there is nothing other than conjecture to show that Garrett suspected Watts or anyone else as the guilty party, or that the shooting actually arose out of an affair between the two. Until conclusively shown that the alleged immoral acts of Watts committed prior to his death, or that the alleged plans for an immoral meeting was overheard and caused the shooting, his dependents should not be deprived of their right to receive compensation.''

In holding that the claimants are not entitled to recover in this case, we do not lose sight of the fact that ██ ██ the Workmen's Compensation Act, Chapter 354, Laws of 1948, should be given a liberal interpretation in order to effect its salutary purposes. Deemer Lumber Co. v. Hamilton, 211 Miss. 673, 52 So. (2d) 634. But we must also not lose sight of the fact that it is the duty of the court to construe the Act as it is written. In Section 2(2) of the Act the word ''injury'' is defined as follows: '' 'Injury' means accidental injury or accidental death arising out of and in the course of employment, and includes injuries to artificial members; and also includes an injury caused by the wilful act of a third person directed against an employee because of his employment, while so employed and working on the job.''

''While the interpretation of the phrase 'arising out of the employment', as used in workmen's compensation acts to define the injuries compensable thereunder, has given rise to many questions of considerable difficulty to which the decisions are not harmonious, there is general agreement upon the proposition that ██ ██ an

injury arises out of an employment when but only when there is a causal connection between such injury and the conditions under which the work is required to be performed, it is not sufficient that the employee is at the place of his employment at the time of the accident and doing his usual work." 58 Am. Jur., Workmen's Compensation, p. 718, Par. 211.

In discussing the meaning of the words "Arising out of and in the course of employment" Schneider, often quoted by the courts in compensation cases, says: "As has already been indicated, it has been held quite uniformly that an injury arises out of the employment when there is a causal connection between the conditions under which the work is required to be performed and the resulting injury. * * * The fact that one is working at the time he is injured, and would not have suffered injury had he not been employed, does not show a causal connection between the employment and the injury, nor will a showing that the employment brought the party to the place where injured and that he would not have met with the accident elsewhere show a proximate causal relation between the employment and the injury." "The risk must be reasonably incidental to the employment * * *. There must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury." Schneider, Vol. 6, pages 7, 32 and 33.

Under the Mississippi statute, if the injury or death has been caused by the willful act of a third person, it must be shown that such willful act was directed against the employee "because of his employment, while so employed and working on the job."

It is undoubtedly true that Watts' employment brought him to the Garrett home the day he was killed. But proof of this fact is not enough to establish legal liability against his employer under the Workmen's Compensation Act. Before the injury can be held to be compensable, it must be shown that the injury arose out of Watts'

employment, and that Garrett shot Watts because of his employment. In other words ▆▆ there must be shown some causal connection between the injury and the employment other than the mere fact that the employment brought Watts to the place where he was injured, and Watts' employment must have been connected with his injury in some more direct manner than the mere furnishing of an opportunity to Garrett to commit the assault upon him.

There is no direct testimony in the record to show that Watts' employment was in any manner a contributing cause to his injury. He did not become involved in a quarrel with Garrett over the receipt or delivery of laundry, or the collection of a laundry bill, or because of any dissatisfaction with the service rendered by the Brookhaven Steam Laundry, or by Watts as its employee. Garrett and Watts had had no sharp words concerning the quality of service that Watts had rendered in the handling of the laundry for Garrett and his family. ▆▆ So far as this record shows Garrett killed Watts because Garrett believed that Watts was having improper relations with his wife. The fact that Watts was an employee of the Brookhaven Steam Laundry was a contributing cause of Watts' being at the Garrett home that day, but it was in no sense a contributing cause of the willful shooting of Watts by Garrett.

In 58 Am. Jur., Workmen's Compensation, p. 765, Par. 265, it is said that the general rule is that an injury inflicted upon a workman by the willful or criminal assault of a third person may be regarded as an accidental injury within the meaning of that term as used in a Workmen's Compensation Act. ''It is also established that such an injury is to be regarded as having arisen out of the employment when the nature of the employment is such as naturally to invite an assault, or when the employee is exposed to an assault by the character of his work, as when he is protecting or in charge of his employer's property, and the assault naturally results be-

cause of the employment, and not because of something unconnected with it, so that it is a hazard or special risk of the work'', But, ▮▮ ''when the assault is unconnected with the employment, or is for reasons personal to the assailant and the one assaulted, or is not because the relation of employer and employee exists, and the employment is not the cause, though it may be the occasion of the wrongful act, and may give a convenient opportunity for its execution, it is ordinarily held that the injury does not arise out of the employment.'' Dallas Mfg. Co. v. Kennemer, 243 Ala. 42, 8 So. (2d) 519; Allburn Coal Corp. v. Wilson, 222 Ky. 740, 2 S. W. (2d) 365; State, ex rel. Common School Dist. No. 1 in Itasca County v. District Ct., 140 Minn. 470, 168 N. W. 555, 15 A. L. R. 579; Service Mut. Ins. Co. of Texas v. Vaughn, Tex. Civ. App., 130 S. W. (2d) 392. Other more recent cases in which the last mentioned rule has been recognized and applied are, January-Wood Co. v. Schumacher, 1929, 231 Ky. 705, 22 S. W. (2d) 117; Bluegrass Pastureland Dairies v. Meeker, 1937, 268 Ky. 722, 105 S. W. (2d) 611; Service Mutual Ins. Co. of Texas v. Vaughn, 1939, Tex. Civ. App., 130 S. W. (2d) 392; Industrial Commission v. Strome, 1941, 107 Colo. 54, 108 P. (2d) 865; Perez v. Fred Harvey, Inc., 1950, 54 N. M. 339, 224 P. (2d) 524; Harden v. Thomasville Furniture Co., 1930, 199 N. C. 733, 155 S. E. 728; Elrod v. Union Bleachery, 1944, 204 S. C. 481, 30 S. E. (2d) 73; Bridges v. Elite, Inc., 1948, 212 S. C. 514, 48 S. E. (2d) 497; Spring Canyon Coal Co., v. Industrial Commission of Utah, 58 Utah 608, 201 P. 173; Ramos v. Taxi Transit Co., 1949, 276 App. Div. 101, 92 N. Y. S. (2d) 744.

In the case of January-Wood Co. v. Schumacher, supra, the Court held that under the Kentucky Workmen's Compensation Act the fact that a night watchman's duty required his presence in such a place as gave one bearing personal animosity toward him as the husband of the former's paramour an opportunity to murder him with less probability of apprehension than if he did so else-

where, did not constitute such causal relation as to bring such result within the term "arising out of his employment". [231 Ky. 705, 22 S. W. (2d) 120] The Court said in its opinion that the compensation act did not afford compensation for injuries or misfortunes which were merely contemporaneous or coincident with the employment, or collateral to it. The Court said: "In the instant case the personal animosity of Eddings was the direct cause of the employee's death. He did not kill Schumacher because he was the company's night watchman on duty, but because he was the husband of his paramour. Does the fact that his duty put him in such a place as gave his murderer an opportunity to carry out his nefarious design with less probability of apprehension than if he did so elsewhere constitute such causal relation as to bring the result within the term 'arising out of his employment'? We hardly think so, on both reason and authority."

In the case of Service Mutual Ins. Co. of Texas v. Vaughn, supra [130 S. W. (2d) 393], the Court held that a night watchman's murder by a son-in-law, because of the feeling that the son-in-law had against the night watchman caused by the refusal of the wife of the son-in-law to live with the son-in-law, was not compensable under the Texas statute, which provided that the term "injury sustained in the course of employment" shall not include "an injury caused by an act of a third person intended to injure the employee because of reasons personal to him and not directed against him as an employee, or because of his employment."

In the Bluegrass Pastureland Dairies v. Meeker, supra, the Court held that the murder of a milk deliverer by a former customer on the porch of the former customer's home, under the belief that intimacy had arisen between the milk deliverer and the customer's wife, was not compensable because the death of the milk deliverer did not arise out of the employment, notwithstanding evidence, which was contradicted, that the milk distributor's offi-

cers, with knowledge of the former customer's suspicion, directed the milk deliverer to go to the former customer's home to return an overpayment on a milk bill. In that case the court said [268 Ky. 722, 105 S. W. (2d) 616]: "The proper solution of the question must not be influenced by the fact that the employment furnished the occasion for the infliction of the injury, since the occasion for the infliction is quite distinct from the injury—the occasion furnishing only an opportunity for the wholly independent and disconnected cause to operate. Here, as in the January-Wood Company case, and as in the Scholtzhauer case, the cause of injury to and death of the servant was something wholly independent of, and by no means incident to the employment of the servant; nor did it result from or grow out of the performance of any duty that he owed to or was discharging for the master. Whether Poulter was correctly informed about the alleged intimacy between the deceased and his wife, or whether he had been given false information concerning that matter and entertained an erroneous impression relating thereto, can make no difference in this case, since the fact is that he, according to the undisputed proof, was then laboring under the impression that his domestic peace and happiness had been invaded by Meeker, the deceased servant. Such belief had engendered in his breast hostility toward the servant, and the killing resulted solely from that fact, and from no fact incidental to, issuing from, or growing out of the servant's employment; the latter serving only to make an occasion for Poulter's wreaking vengeance and inflicting injuries complained of."

In the case of Ramos v. Taxi Transit Co., supra, the Court held that where a taxicab driver was killed in the course of his employment, but the undisputed proof showed that he was killed by a personal enemy for purposes of revenge, benefits under the Workmen's Compensation law could not be awarded, since the killing did not arise out of the employment. In that case the court said

[276 App. Div. 101, 92 N. Y. S. (2d) 750]: "The marked trend of liberalization in workmen's compensation cases has not obliterated the dual test that it be shown both that the injury arose 'out of' as well as 'in the course of' employment, and the latest cases are as careful to require both conditions to exist as the earliest ones. Cf. Matter of Industrial Commissioner (Siguin) v. McCarthy, supra, 295 N. Y. at pages 443, 446, 447, 68 N. E. (2d) at pages [434], 435, 436.

"The employment brought the deceased face to face with his enemy, and there is no difficulty in saying that this murder arose 'in the course of' employment; but it cannot be said, and the board had no evidence upon which to erect a finding, that the murder arose 'out of' the employment. All the evidence in the case demonstrates that the deceased was murdered for a personal cause having no relation to employment."

In the case of Ex parte Coleman, 211 Ala. 248, 100 So. 114, 115 the Court said that from the fact alone of a wilful assault upon a workman, it cannot be presumed that it arose out of his employment. That conclusion must be drawn, if at all, from the circumstances of the case, or from the testimony of the witnesses, tending to show the causal relation of the employment to the injury; and "the rational mind must be able to trace the resultant personal injury to a proximate cause set in motion by the employment and not by some other agency."

The burden of proof was on the appellees to show by competent evidence that there was a causal connection between the willful act of Garrett in killing Watts and Watts' employment by the Brookhaven Steam Laundry. The circumstances of the killing, as testified to by the witnesses, did not indicate that Garrett shot Watts because of Watts' employment; and if Mrs. Garrett's testimony were rejected in its entirety there would be no proof in the record to sustain appellees' contention that the killing occurred because of Watts' employment. The position and locality rule stated in Hartford Acci-

dent & Indemnity Co. v. Cardillo, 72 App. D. C. 52, 112 F. (2d) 11, which is referred to in the appellees' brief, cannot take the place of the proof of causal connection which is required by the Mississippi statute, when the injury has been caused by the willful act of a third person. Watts' duty to pick up the laundry for his employer may have been a concurrent cause, or the sole cause, of his visit to the Garrett home on the day of the killing, but it was not a concurrent cause of the injury inflicted upon him by Garrett when Garrett shot him.

We think that the proof in this case shows clearly that Watts' death was caused by the willful act of a third person intended to injure him because of reasons personal to him, and not because of his employment by the Brookhaven Steam Laundry. There was no substantial proof in the record to support the findings of the Commission that Watts' death arose out of his employment or that Garrett killed Watts because of his employment.

For the reasons stated above the suggestion of error is sustained, the former opinion rendered in this cause on November 26, 1951, is withdrawn, and the judgment entered herein affirming the judgment of the lower court is set aside, and the judgment of the circuit court affirming the award made by the Commission and the order of the Commission awarding compensation to the claimants are reversed and judgment entered here in favor of the appellants.

Suggestion of error sustained, the judgment of the lower court reversed and judgment rendered for the appellants.

**McGehee, C. J.** and **Roberds, Alexander** and **Holmes, JJ.,** concur.

**Ethridge, J.** (dissenting).

The effect of the majority opinion on suggestion of error is to place a wholly unwarranted restriction upon the terms and purposes of the Mississippi Workmen's

Compensation Act. A by-product of that interpretation is to deny compensation to the widow and child of the deceased employee based upon a reading of the statute which is wholly out of line with practically all of the decisions in recent years from other states interpreting substantially similar legislation. The majority opinion overturns the decision of the attorney-referee, who was then chairman of the Commission, on a finding of fact, where he saw the witnesses and had the benefit of analyzing their testimony from personal observation. It also reverses the considered judgment of the entire Commission, and subsequently of the Circuit Court of Copiah County. And it does those things on legal theories which are not supported by the majority of the courts today, and on a disputed issue of fact.

The original opinion rendered in this case and now withdrawn as the majority view is printed in 55 So. (2d) 381-398, and sets forth in detail the views of the now dissenting judges. I will not repeat that discussion, but will refer to and incorporate in this opinion that opinion originally rendered. But several additional comments are pertinent. This case was considered by the court in several conferences prior to handing down the original decision. At that time the court consisted of six judges and three commissioners. Three of the justices voted to affirm the award, two dissented and one wrote a separate opinion which was in effect a dissent. Since that time the court has been increased to nine judges. Prior to handing down the original opinion in 55 So. (2d) 381, every one of the cases substantially relied upon by appellants and by the majority opinion on suggestion of error were considered in conference, and it was determined then that the statutory interpretations in them were not sound and should not be applied to assaults by third persons under the Mississippi Workmen's Compensation Act. See 55 So. (2d) 391-392.

Sec. 2(2) of the Act, Chap. 354, Laws of 1948, provides that "injury" includes "an injury caused by the wilful

act of a third person directed against an employee because of his employment, while so employed and working on the job." The majority opinion now concludes that this imposes a distinct requirement as to wilful assaults by third persons, which is in addition to the requirement of Sec. 4 that it must arise out of and in the course of employment. Yet it is well established that the principal purpose of this provision is to remove the necessity of inquiry as to whether the injury is "accidental". To that effect, the original opinion cited Asaeda v. Haraguchi, 37 Hawaii 556, 559 (1947), and Hartford Accident and Indemnity Company v. Hoage, 1936, 66 App. D. C. 160, 85 F. (2d) 417. See 55 So. (2d) 386. These appear to be the only cases considering this problem as to a substantially similar statute. The majority opinion on suggestion of error does not distinguish these only precedents which are in point, nor does it show wherein they are unsound.

It is said that the wilful purpose of the assailant is the main criterion for determining whether the employee is covered by an assault by a third person upon him. But cases dealing with assaults by insane persons on workers are conclusive on this position, I think, because they negative and contradict it. Such cases make it manifest that the mental condition or attitude of the assailant is not the determining factor, because in the insane cases the assailant has no mental volition. If the mental attitude of the assailant were important, the insane cases would not have allowed coverage. Those cases are discussed in the original opinion, 55 So. (2d) 381, 395.

The award by the Commission should be upheld upon any one of three basic propositions: (1) That the employment was a concurrent, contributing cause of Watts' death; (2) that the time-place rule is the better rule in assault cases and is in accord with established precedents from the courts of numerous other states; (3) and further, that the Commission was amply warranted in disbelieving the testimony of Mrs. Garrett, for the reasons set

forth in 55 So. (2d) 397-398. The fundamental question is whether there is substantial evidence to support the finding of the hearing examiner and of the Commission. This limitation upon this court's scope of review is well established in our previous decisions. Yet this award is overturned with a statement of the conclusion that no such substantial evidence exists, without indicating in what respects it is lacking. The fundamental responsibility for administering the Workmen's Compensation Act is placed upon the Commission and not upon this Court.

Since the passage of the first compensation act in this country around 1910, employees have had considerable difficulty in obtaining from the courts practical interpretations of workmen's compensation legislation in the light of its purposes and without the restrictions of the common law of torts. The common law theories of deviation, detour, and intervening cause, for example, are of questionable value in compensation cases in determining whether the required causation exists. Horovitz Assaults and Horseplay under Workmen's Compensation Laws, 44 Ill. L. Rev. 311 (1946). At the time Watts was shot he was performing a service of benefit to his employer. He was picking up the clothing for cleaning which would result in a profit for the appellant employer. There is no dispute whatever in the record about this. He was working on his regular laundry route, and admittedly was on the porch at the time for the purpose of picking up the laundry. He had done nothing illegal at the time. Under the authority of modern common law and workmen's compensation cases, there is substantial evidence to support the finding of the attorney-referee that Watts' job was a concurrent, contributing cause of his death. A logical and practical interpretation of the workmen's compensation act cannot be obtained by parsing the statute as grammarians, or by applying it as an abstract exercise in lexicography, or by disregarding the manifest legislative intent that the abstract common-law

theories of intervening and proximate cause should not be applied in determining a causal relationship to the employment. The reversal of the award is, in my opinion, based upon these factors, and not upon a sound application of the statute and the legislative purpose. The restrictions imposed by Sec. 2(2) of the act as interpreted concerning wilful assaults by third persons will exist only under such limited circumstances. However, the inequity of this unwarranted reading of Sec. 2(2) of the act as to wilful assaults by third persons will affect numerous claims under the act. The controlling opinion indicates that the wilful purpose of the third party assailant, however misguided and incorrect it may be, is the main criterion for determining whether the employee is covered by the assault upon him. Continued application of this principle will effectively deny recovery to admittedly innocent employees who are working on their jobs at the direction of their employer. I would overrule the suggestion of error.

**Hall, Lee** and **Arrington, JJ.**, join in this dissent.