## Bluegrass Pastureland Dairies v. Meeker et al.

(Decided April 30, 1937.)

WILSON & HARBISON and JOHN P. CROSBY for appellant.

W. W. MEEKS, STOLL, MUIR, TOWNSEND & PARKS and B. M. VINCENT, Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On and prior to November 21, 1933, the appellant and plaintiff below, Blue Grass Pastureland Dairies, a corporation, was engaged in the business of distributing milk to consumers in the city of Lexington. For a considerable period prior to that time Glenn F. Meeker was in plaintiff's employ as a deliverer of milk to its customers in a prescribed district in the city within which Ernest Poulter resided, and he was a customer of plaintiff to whom Meeker delivered milk. Poulter was a plumber by trade and was married but had no children. On the day named he shot and killed Meeker on the porch to his residence at about 11 o'clock a. m. The deceased servant left surviving him a widow and some infant children, all of whom were dependents under our Workmen's Compensation statute (Ky. Stats., sec. 4880 et seq.) under which both employer and employee were operating. The widow, for herself and children, made application to the Workmen's Compensation Board for an award under the statute referred to, and after evidence was taken and submission of the application, a referee of the board sustained applicant's motion and rendered an award of $11.37½ per week from the date of decedent's death for a period of 335 weeks plus the sum of $75 for funeral expenses. Plaintiff asked for a reconsideration before the whole board, and upon that hearing two of its members sustained the referee, whilst one of them dissented. Later, plaintiff filed this review action in the Fayette circuit court, in which it contended that both the referee, and the majority of the members of the Board, erroneously rendered the award, because, as contended by its learned counsel, the death of the servant, though possibly arising "in the course" of the servant's employment, yet it did not arise out of it. It is that question alone that is involved in this case, since if the death of the servant did not arise "out of" his employment, the case is not compensable within the purview of our compensation statute; it being so limited by section 4880 of Baldwin's

1936 revision of Carroll's Kentucky Statutes, which is the first section of the act.

The question is one largely, if not exclusively, determinable from the testimony adduced at the hearing before the board, and which, as the law requires, was also the only testimony heard by the Fayette circuit court in its review of the board's award. There is but little dispute in the testimony and, according to our view, the issues upon which there is a contrariety of testimony are not controlling, since if the facts were and are as contended by the dependents of the deceased servant, the applicable legal principle would not be altered. We will now proceed to make a substantial statement of the testimony adduced by the parties upon the original hearing.

As stated, Meeker had been making deliveries of milk to Poulter's residence for quite a while before he met his death. In the course of time Poulter, from observations he claims to have made, and from information furnished him by a sister—who resided in Lexington and more or less frequently visited her brother's family—became convinced that an intimacy had grown up between Meeker and his (Poulter's) wife. On the day before the killing of Meeker, Poulter went to the head office of plaintiff and paid his milk bill. What happened at that place and time constitutes the first contradiction in the testimony. Poulter stated that he inquired for his milk bill and was informed that it was 75 cents, which he paid; that he then informed plaintiff's officers in charge of its office that the reason why he was withdrawing himself as a customer was because of Meeker's undue intimacy with his wife, and he stated that he told the officers to not allow Meeker to come about his residence any more. The officers, on the issue as to what occurred at the time (other than the payment of the account), said that Poulter made no statement concerning any such reason why he was withdrawing his patronage, but that he said he had a friend who was embarking in the same business and that he thought he should patronize his friend.

Later in the day Meeker appeared at the office and was told about Poulter's having paid his bill of 75 cents, when he (Meeker) stated to his superiors that the bill was only 70 cents, whereupon the witnesses stated that they told him to return back to Poulter the overpay-

ment of 5 cents, which would not only show fairness and comport with honesty, but might also have a tendency to restore him as a customer. Poulter, on the next day, was working for a neighbor only two doors from his residence when he saw Meeker drive up in front of it and get out of his milk truck and go into the house. He stated that he waited some 10 or 15 minutes, expecting Meeker to depart from his house, but that he did not do so, and he then (having prior to that time armed himself) left his work and went to his house, "to see what was going on." He then stated that:

"When I walked down to my house he was standing at the door, my wife was standing just inside of the house in the room, he had his arm around my wife's waist.

"Q. 8. Mr. Poulter, when you got down there, what, if anything, was said between you and Mr. Meeker? A. Well, I asked Mr. Meeker if he didn't get the message that I left at the office the day before for him to stay away from my home. I said, 'I left word for you not to come around to my home any more, here you are again today.' I said, 'You get off my porch, leave here, and don't let me catch you back here any more.'

"Q. 9. Then what did he do? A. He said, 'Wait a minute, let me talk to you.'

"Q. 10. Then what did he do? A. I saw him throw his hand back to his hip pocket.

"Q. 11. How did he throw it back? A. He just throwed his hand back like that (illustrating).

"Q. 12. What did you think he was going to do? A. I thought he was going to pull a gun on me.

"Q. 13. Would there have been any difficulty between you and Mr. Meeker if you had walked down and found Mr. Meeker simply repaying the nickel? A. No, sir, there would not have been.

"Q. 14. I wish you would state just exactly why did you shoot Mr. Meeker? A. Because he didn't get off the porch and leave when I asked him to, but he threw his hand to his pocket like he was attempting to get a gun."

Mrs. Poulter was introduced as a witness on what happened upon the fatal occasion, and her testimony with reference thereto constitutes the only other contra-

diction in the entire testimony. She stated that when Meeker arrived at her residence on the fatal occasion, there was a Mr. Peck in the house collecting a weekly insurance premium from her on some kind of life policy she was carrying. She then said:

"During that time Mr. Meeker drives up in his truck and gets out and comes up to the door, and as he came up he began to talk to Mr. Peck, said several words to him. In a few minutes he goes down and gets the nickel.

"Q. 4. Where did he get the nickel? A. He got it out of his pocket.

"Q. 5. Out of his pocket? A. Just reached down in his pocket and laid a nickel out. I said 'What is that for?' He said, 'Why your husband was at the office yesterday afternoon—he was there and he paid seventy-five cents and it wasn't but seventy cents.' So then Mr. Peck said to him, said, 'I see you have a lot of change,' says, 'I need some more change,' said, 'You give me some change.' So he went ahead and give him the change, then Mr. Peck walked off.

"Q. 6. Then what happened to Mr. Meeker? A. Mr. Meeker was fixing the money I reckon that he had, you see he never did multiply a word. I stood there right in the door, I saw my husband coming down the street, I said, 'There comes my husband now.' So he never multiplied a word, Mr. Meeker never. My husband stepped up about this close to me (indicating about six feet and said, 'You get off here' Mr. Meeker says something, he began to try to explain something, but I don't know what he said. By that time my husband steps right upon the porch then and shot. He just stepped upon the porch and shot him.

"Q. 7. Did you see Mr. Meeker make any motion towards his hip pocket when Mr. Poulter came? A. Yes, my husband says to get off, he kindly, you know, I noticed he swung his arm or hand.

"Q. 8. Just swung his arm or hand? A. Yes, I remember my husband told him to get off and he made some kind of motion.

"Q. 9. Now, did Mr .Meeker on that occasion go inside of the house at all? A. Mr.. Meeker never was no farther than my door not any time, he sure was not. He was a nice man, I can say that for him. I didn't

even know the man's name. The detectives could tell you that they asked me that evening what his name was, I didn't know the man's name.''

As hereinbefore stated, a Mrs. Carter, who is a sister of Poulter, had on a previous occasion—as she testified—seen Mrs. Poulter and Meeker in a compromising position and had informed her brother of that fact. Such information, together with facts that he saw and observed, was the only cause for his state of mind towards Meeker, and naturally he determined that the latter should cease visiting his house. It is contended by counsel for the dependents (and which fact was also emphasized by the board and its referee) that Poulter told the truth when he stated that he informed plaintiff's officers and servants at the time he paid his bill the reason for doing so and for withdrawing his patronage, i. e., on account of Meeker's conduct toward his wife. From that premise—the proof of which is so assumed and accepted—it is deduced that plaintiff was at fault when it agreed for Meeker to return to Poulter the extra 5 cents that he had paid in settlement of his account. But we can discover no such determinative effect either sustaining or rejecting the application to be attributed to that assumed fact, although the testimony of the officers of plaintiff flatly contradicted Poulter's version of what happened. But, since it is our duty to accept as facts those found by the board, and for which there was testimony to support, the case will be determined on the assumption that Poulter did tell plaintiff's officers and agents when he paid his account that he did so because of Meeker's conduct toward his wife. If this was a suit for damages by Meeker's administrator against plaintiff, the fact that they directed him to return to the residence of Poulter, knowing the latter's angered state of mind, might be a relevant one; but, under the view we take of this case (it being no such action for damages), the fact must be regarded as of no forceful consequence, and the case will be disposed of by us independently of such alleged imparted information by Poulter.

All attorneys in the case admit, and all courts within jurisdictions wherein a compensation statute has been enacted containing similar provisions as those referred to supra declare, that an injury, in order to be compensable under the statute, must be ''sustained

by the employee by accident (a) arising out of, and (b) "in the course of," "his employment; and that unless the injury or death to or of the servant arises *out of* his employment no compensation is recoverable. Since counsel do not argue in their briefs one of the statutory requisites, i. e., that Meeker's death was produced "in the course of" his employment, we will devote no time to a consideration of that requirement. But plaintiff's counsel, both vigorously and learnedly, argue and contend that his death did not arise "out of" his employment, and the remainder of this opinion will be devoted exclusively to a discussion of that question.

In support of the board's conclusion—and also in support of the court's judgment—counsel for the dependents cite a number of cases wherein the courts rendering them concluded, under the liberal rule of interpretation of such statutes, that from the evidence adduced the particular injury involved arose out of the servant's employment. But the facts in each and all of them were distinctly different from those appearing in this case—except perhaps the case of Empire Health & Accident Insurance Company v. Purcell, 76 Ind. App. 551, 132 N. E. 664, an Indiana case, the facts of which approach nearer to this one than any of the others. However, there did appear in that case as much of a pronounced line of demarcation separating the requisites for liability and nonliability for compensation, as is manifested by the facts of this case.

Perhaps no question of recent origin in the law has been so fruitful of legal discussions, and border-line decisions of courts, as the one now under consideration, i. e., when does an injury to a servant "arise out of" his employment so as to entitle him or his dependents, if death ensues, to compensation? We repeat that all the cases agree—and so do counsel for the dependents in this case—that in order to meet the requirement of the statute the injury or death must have arisen out of the servant's employment. A fair statement of the requirement is that the accident "had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." Oklahoma-Arkansas Telephone Co. v. Fries, 128 Okl. 295, 262 P. 1062, 1065, a case cited and relied on by counsel for dependents. The same interpretation, as forced by the logic of the situation, has been approved and upheld by

a number of cases from this court, one of the latest of
which is A. C. Lawrence Leather Co. v. Barnhill, 249
Ky. 437, 61 S. W. (2d) 1, in which the case of Palmer
v. Main, 209 Ky. 226, 272 S. W. 736, 738, was referred
to with approval. In the latter case we said that: "An
accident arises out of the employment within the mean-
ing of the Workmen's Compensation Act if it was the
direct and natural result of a risk reasonably incident
to the employment in which the injured person was
engaged." Later, in the case of January-Wood Co. v.
Schumacher, 231 Ky. 705, 22 S. W. (2d) 117, 120, the
holding in the prior cited cases was approved, and in
that (the last cited) case the facts were in legal effect
what we conclude to be on all fours with those appear-
ing in this case, save and except the employer in the
January-Wood Case was not aware of any ill feeling
between the employer's servant and the one who in-
jured him, as is contended was true in this case and to
which we have hereinbefore referred. But that fact,
as we have determined, can have no material effect
upon the applicable law in the administration of the
Compensation Act, although, as we have hereinbefore
stated, it might or might not have some bearing in a
suit by the employee, or his administrator if he was
killed, against his employer for damages. In the Jan-
uary-Wood Company Case the servant was at his post
of duty as a night watchman when an enemy of his
came to the place and killed him. In disallowing com-
pensation, we said, inter alia: "Schumacher's death
cannot be traced to any cause set in motion by his em-
ployment. We cannot reason from the sequel to the
cause. The fact that he was on the company's premises
at work when killed by Eddings for reasons wholly un-
connected with his employment and entirely unasso-
ciated with the relation existing between his employer
and himself does not seem to this court sufficient to
justify an award of compensation, which is in effect
but holding the company responsible in a degree for his
murder."

In line with the cited domestic cases is also that of
In re McNicol, 215 Mass. 497, 102 N. E. 697, L. R. A.
1916A, 306, in which the court said: "* * * if the in-
jury can be seen to have followed as a natural incident
of the work and to have been contemplated by a reason-
able person familiar with the whole situation as a re-
sult of the exposure occasioned by the nature of the em-

ployment, then it arises 'out of' the employment." The same observations as to what is the true scope and meaning of the words "arise out of," as employed in the statutes, were adopted and approved in the comparatively late cases of: Gavros' Case (1922) 240 Mass. 399, 134 N. E. 269, 21 A. L. R. 755; Urak v. Morris & Co. (1922) 107 Neb. 411, 186 N. W. 345; Scholtzhauer v. C. & L. Lunch Co. (1922) 233 N. Y. 12, 134 N. E. 701, 702; Bryden v. Industrial Accident Commission (1923) 62 Cal. App. 3, 215 P. 1035; Ex parte Coleman (1924) 211 Ala. 248, 100 So. 114; Royal Indemnity Company v. Industrial Accident Commission (1924) 192 Cal. 675, 221 P. 371; W. A. Jones Foundry & Machine Company v. Industrial Commission (1924) 312 Ill. 27, 143 N. E. 420, and I. T. I. O. Company v. Lewis (1933) 165 Okl. 26, 24 P. (2d) 647. The cited Scholtzhauer Case contained facts very similar to those here presented, and in denying compensation to the murdered servant's dependents the court said: "The only suggestion that the employment had any bearing on the injury was that the employment brought the two persons together. The murder, however, arose not out of the employment, but because the deceased refused to accept Arthurs' invitation, and his anger by reason thereof. The fact that the murder took place on the employer's premises was a mere incident. It might equally well have happened on the sidewalk in front of the building, or while the daughter was on her way home, or at any other place where Arthurs had chanced to meet her." (See opinion for the full facts.)

To illustrate and emphasize our position, let it be supposed that Meeker, in the performance of his duties as servant to his master, upon an occasion while at Poulter's house, had engaged in a crap game with him, or in a controversy about some totally unrelated subject to the milk business, and had become involved in a difficulty, regardless of who was to blame therefor, and had been injured or killed by Poulter, could it with any logical plausibility be said that the injury arose "out of" his employment? It is true that the occasion, i. e., the coming together of the two, may have originated from or arose out of the employment of Meeker, but the cause of the injury emanated from a source entirely disconnected from the employment and which was neither directly nor remotely attributable to it.

Again, suppose that Meeker, on an occasion of his visit to Poulter's house, had said or done something indicating a purpose to commit some crime, or which led the inmates of the house to so believe, and which precipitated a difficulty as a result of which he was injured or killed, it would require an unauthorized stretch of interpretation to hold that the injury received in such circumstances arose "out of" his employment. The facts adduced make the case, according to our view, a parallel one to the supposed ones and to be followed by like consequences.

The opinion could be extended over many pages were we to refer to and comment upon each case cited by respective counsel, but we deem it unnecessary to do so, since what has already been said is sufficient to establish the declared principle to be that the injury, in order to be compensable, must have been an incident of, or to have issued from, the performance of some duty that the servant owed to his master; and that it resulted as a natural consequence of performance of that duty. The proper solution of the question must not be influenced by the fact that the employment furnished the occasion for the infliction of the injury, since the occasion for the infliction is quite distinct from the injury—the occasion furnishing only an opportunity for the wholly independent and disconnected cause to operate. Here, as in the January-Wood Company Case, and as in the Scholtzhauer Case, the cause of injury to and death of the servant was something wholly independent of, and by no means incident to the employment of the servant; nor did it result from or grow out of the performance of any duty that he owed to or was discharging for the master. Whether Poulter was correctly informed about the alleged intimacy between the deceased and his wife, or whether he had been given false information concerning that matter and entertained an erroneous impression relating thereto, can make no difference in this case, since the fact is that he, according to the undisputed proof, was then laboring under the impression that his domestic peace and happiness had been invaded by Meeker, the deceased servant. Such belief had engendered in his breast hostility toward the servant, and the killing resulted solely from that fact, and from no fact incidental to, issuing from, or growing out of the servant's employ-

ment; the latter serving only to make an occasion for Poulter's wreaking vengeance and inflicting the injuries complained of. Another domestic case supporting the same view is that of Scott Tobacco Company v. Cooper, 258 Ky. 795, 81 S. W. (2d) 588. Duly regardful of the interpretations to which we have referred, we see no escape from the conclusion that this case should be governed by the principles announced in the January-Wood Company Case, which is the one more directly in point than any of the others, and which we conclude is conclusive of the question herein involved.

Wherefore, the judgment is reversed, with directions to set it aside and to enter one directing the board to dismiss the application, and for other proceedings not inconsistent with this opinion.