Steven WILLIAMS, Deceased,
et al. Appellant,

v.

WHITE CASTLE SYSTEMS, INC.; Hon. James L. Kerr, Administrative Law Judge; and Workers' Compensation Board Appellees.

No. 2004–SC–1048–WC.

Supreme Court of Kentucky.

Sept. 22, 2005.

James D. Howes, Howes & Paige, PLLC, Louisville, Counsel for Appellant.

David L. Murphy, Clark, Ward & Cave, Louisville, Counsel for Appellee.

## OPINION OF THE COURT

An Administrative Law Judge (ALJ) determined that an injured worker's death was due to multiple drug toxicity and was not causally related to his work. The Workers' Compensation Board (Board) rejected arguments that the finding was erroneous under the positional risk theory and under KRS 342.680, and the Court of Appeals affirmed the Board. Likewise, we affirm.

On January 24, 2000, Steven Williams sustained a work-related back injury while working for the defendant-employer. He underwent an initial surgery in April, 2000, after which he filed an application for benefits. He underwent a second surgery on February 8, 2001, and died on February 12, 2001, one day after his release from the hospital. Diana Williams, his mother and the executrix of his estate, revived the claim and amended it to assert that his death was the result of post-operative medication and, therefore, was a compensable event. Lori Blair asserted that she was the mother of Williams' minor child, Rachael Williams, and was joined as a party.

Diana Williams testified that her son had suffered a previous back injury and undergone multiple back surgeries before January 24, 2000. She stated that her son was not depressed and had a positive outlook after the final surgery. He was sent to her home following his release from the hospital and received prescriptions for Oxycontin and Ambien. On February 12, 2001, her son was asleep when she left for her job on the second shift. When she returned after midnight, he was dead. She *did not know if he had any visitors*

that day but recalled that his prescriptions were on his nightstand.

Dr. Barbara Weakley–Jones testified that she performed a post-mortem examination on February 13, 2001, and attributed Williams' death to multiple drug toxicity. Blood toxicology was positive for oxycodone (Oxycontin), meperidine (Demerol), zolpidem (Ambien), and diphenhydramine (Benadryl). Urine toxicology was positive for opiates and cocaine metabolites, but she thought that cocaine did not contribute to his death.

In a report authorizing the post-mortem examination, Dr. Richard Greathouse, the Jefferson County Coroner, listed the date of death as being between 5:00 p.m. on February 12 and 1:00 a.m. on February 13, 2001, when Ms. Williams found her son in bed. He noted that Williams had undergone back surgery on February 8, 2001; that he was released from the hospital on February 11, 2001; and that he had no complaints after his release. The report noted that the claimant had prescriptions for Trazodone, Oxycontin, Ambien, and Neurontin.

In a subsequent letter to counsel for the claimants, Dr. Greathouse indicated that Williams' death occurred on February 13, 2001, and that the official cause was multiple drug toxicity. He noted that Williams was given a prescription for Oxycontin and for Ambien on February 11, 2001, when he was released from the hospital, and that the coroner's office had ruled the death accidental. The letter recited the toxicology results. It stated subsequently that the drugs were in Williams' system and that he had taken them due to the surgery and resulting pain, which were due to the work-related injury. Finally, it stated that had Williams not sustained the back injury, he would not have had the surgery and would still be alive.

When deposed subsequently, Dr. Greathouse testified that Williams was given the painkillers oxycodone and meperidine immediately following the surgery to control his pain. In his opinion, the cause of death was an accidental multiple drug toxicity. He acknowledged that his report listed only Oxycontin and Ambien as having been prescribed when Williams was released from the hospital. He stated, however, that Williams must have also had some Demerol, prescribed or not, because it was also found in his system. When informed that Williams consistently took Ambien, Oxycodone, Trazodone and several other medications up until his death, Greathouse stated that they would not have caused Williams' death if he had taken them as prescribed. He stated that cocaine would remain in a person's system for only 3–4 days at most, that cocaine metabolites can be found in Oxycontin, and that the medical examiners had no proof that Williams was taking cocaine. The blood reports indicated that Williams was taking his prescribed medications, but there was no proof that he was taking them in the proper order, frequency, or amount.

Medical records established that Dr. Majid performed a lumbar fusion on Wiliiams at Jewish Hospital on February 8, 2001. Williams was released on February 11, 2001, with prescriptions for Oxycontin and Ambien. There was no evidence that a physician prescribed or administered Demerol for the effects of Williams' back injury.

Dr. George R. Nichols II, former chief medical examiner for the Commonwealth of Kentucky and present medical director for Quest Diagnostics Medical Laboratory, examined Williams' medical records, the autopsy report, and Williams' pharmacy record. He agreed that the cause of death was multiple drug toxicity and noted that Williams' drug load was consistent prior to

his death. He noted that the Ambien and Oxycontin that were found by the medical examiner were prescribed drugs. Also present were Benadryl, which is an over-the-counter medication that works as a hypnotic, and Demerol, which is a scheduled narcotic and synthetic opiate. He obtained samples of Williams' blood, tested them, and confirmed Dr. Weakley–Jones' findings. He stated that the levels of prescribed drugs that were found were insufficient to cause death and that the Demerol, which was not a prescribed drug, was the "pharmacological straw that broke the camel's back." Noting that Demerol would not have remained in Williams' system at his death had it last been administered at the hospital, Dr. Nichols concluded that it had not been administered there. He stated that the combined levels of Demerol, Oxycodone, Benadryl, and Ambien that were found in Williams' body resulted in respiratory failure that culminated in his death.

Addressing causation, the ALJ noted that the experts agreed regarding the combination of drugs in Williams' body at the time of his death and noted that only Oxycodone and Ambien were prescribed as a result of the back condition. The ALJ concluded from Dr. Nichols' testimony that the Demerol, taken in addition to the other drugs, caused Williams' death, stating as follows:

> While it may never be known as to how the decedent obtained the Demerol, the fact that it was not a prescribed drug for the decedent leads the [ALJ] to conclude in favor of the defendant-employer on this causation issue. It is irrelevant whether decedent committed suicide or voluntarily ingested Demerol for therapeutic or other use. The simple fact is the taking of the Demerol resulted in decedent's death and this fact leads to the [ALJ's] conclusion that decedent's death is not work-related.

Rejecting the employer's intoxication defense, the ALJ noted the absence of any medical evidence that Williams was intoxicated. Furthermore, the ALJ noted that there was no evidence that Williams' failure to follow medical advice regarding his restrictions due to the previous injuries helped to cause the January 24, 2000, back injury.

Appealing, the claimants base their arguments on two statutes. KRS 342.610(3) provides as follows:

> Liability for compensation shall not apply where injury, occupational disease, or death to the employee was proximately caused primarily by voluntary intoxication, as defined in KRS 501.010, or by his willful intention to injure or kill himself or another.

KRS 342.680 provides:

> In any claim for compensation, where the employee has been killed, or is mentally or physically unable to testify as confirmed by competent medical evidence *and where there is unrebutted prima facie evidence that indicates that the injury was work related,* it shall be presumed, in the absence of substantial evidence to the contrary, that the injury was work-related, that sufficient notice of the injury has been given, and that the injury or death was not proximately caused by the employee's intoxication or by his willful intention to injure or kill himself or another. (emphasis added).

The claimants concede that the drugs listed in the post-mortem report were present in Williams' blood and that they worked in combination to cause his death. Their argument is that the ALJ, Board, and Court of Appeals misapplied KRS 342.680 when concluding that Demerol was an independent intervening cause of death without regard to whether Williams' death was due to an accident or suicide. They

assert that it is clear he took Demerol in an attempt to control his pain from the surgery and that there was no evidence he did so for another reason. Therefore, there was unrebutted prima facie evidence that Williams' death was work-related, and although the employer proved that his death was due to the ingestion of a non-prescribed drug, it failed to prove that he intended to harm himself. Noting that KRS 342.610(3) prohibits benefits only in those instances where the worker is injured as the proximate result of "voluntary intoxication" or his "willful intention to injure or kill himself," they complain that the ALJ determined that there was no evidence that Williams was intoxicated but failed to determine whether his death was accidental or a suicide. They assert that it was accidental and that a decision in their favor was compelled.

■ As amended effective December 12, 1996, KRS 342.0011(1) provides that an injury is a work-related traumatic event that proximately causes a harmful change in the human organism. It has long been the rule that a worker may be compensated for all of the harmful changes that flow from a work-related injury and that are not attributable to an independent, intervening cause. See Beech Creek Coal Co. v. Cox, 314 Ky. 743, 237 S.W.2d 56 (1951); Elizabethtown Sportswear v. Stice, 720 S.W.2d 732 (Ky.App.1986). Therefore, the claimants were entitled to benefits for Williams' death if they succeeded in proving that it resulted from his injury rather than an independent, intervening cause.

■ The claimant bears the burden of proving every element of a workers' compensation claim, including causation. See Magic Coal Co. v. Fox, 19 S.W.3d 88, 96 (Ky.2000). Even when a worker's death occurs on the employer's premises, the burden is on those seeking compensation to establish that the death was connected to the individual's work in order for it to be compensable. See Stapleton v. Fork Junction Coal Co., 247 S.W.2d 372 (Ky. 1952); Harlan Collieries v. Shell, 239 S.W.2d 923 (Ky.1951); and Bluegrass Pastureland Dairies v. Meeker, 268 Ky. 722, 105 S.W.2d 611 (1937). Enacted effective January 1, 1973, and amended effective December 12, 1996, KRS 342.680 addresses the problem of proving work-relatedness in instances where the injured worker dies and, therefore, is unable to testify regarding an injury. It authorizes a rebuttable presumption that the injury or death was work-related and precludes an intoxication or suicide defense if there is prima facie evidence that the injury or death was work-related and no substantial evidence to the contrary. The procedural effect of the presumption is to shift to the employer the burden of going forward with substantial evidence that the injury or death was not work-related; however, the burden of proving causation remains on the claimant. See KRE 301; Magic Coal Co. v. Fox, 19 S.W.3d at 95. If the employer fails to meet its burden, the claimant is entitled to the presumption and prevails on the issue of causation. If the employer does meet its burden, the claimant is not entitled to the presumption of causation and must go forward with evidence that is persuasive enough to convince the ALJ that the injury or death was work-related.

■ Contrary to the claimants' assertion, we are not convinced that the ALJ misapplied KRS 342.680. It is undisputed that Williams sustained a work-related back injury and gave timely notice. The matter presently at issue is whether there was substantial evidence that the injury was not the proximate cause of a subsequent harmful change, i.e., Williams' death. The ALJ determined that there was such evidence and was not persuaded

by the claimants' evidence that the death was work-related.

■ There was medical evidence that the drugs that were prescribed for the effects of the back injury would not have caused Williams' death if taken as directed and evidence that taking Demerol in addition to the prescribed medications caused Williams' respiratory failure and ultimately his death. There was also evidence from which the ALJ could reasonably conclude that no physician prescribed or administered Demerol for the effects of the claimant's back injury. Under the circumstances, there was substantial evidence that Williams' death was not due to the effects of his work-related injury. *See Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky.1986). Therefore, the claimants were not entitled to a presumption of causation. The ALJ rejected the employer's intoxication defense. No suicide defense was raised; therefore, it was immaterial whether the death was a suicide. The ALJ simply was not persuaded by the evidence that the effects of Williams' injury were the proximate cause of his death, and any evidence that they were the cause was not so overwhelming as to compel a finding to that effect. *Id.*

The decision of the Court of Appeals is affirmed.

All concur.