Douglas W. **LANE, (Deceased) and Priscilla J. Lane (Administratrix) Appellants,**

v.

**S & S TIRE, INC., # 15; Hon. J. Kevin King, Administrative Law Judge; and Workers' Compensation Board Appellees**

No. 2005–SC–0141–WC.

Supreme Court of Kentucky.

Nov. 23, 2005.

As Modified on Denial of Rehearing Feb. 23, 2006.

Diana Beard Cowden, Lexington, Counsel for Appellant.

Ronald J. Pohl, Picklesimer, Pohl, Kiser & Aubrey, P.S.C., Lexington, Counsel for Appellee.

## OPINION OF THE COURT

Douglas Lane sustained a work-related injury on July 28, 2000, and died of a self-inflicted gunshot wound in March, 2001. Priscilla Lane filed an application for benefits as his surviving spouse and the administratrix of his estate. An Administrative Law Judge (ALJ) rejected her allegation that Douglas's suicide was work-related and awarded Priscilla survivors' benefits under KRS 342.730(3) rather than the death benefits she sought under KRS 342.750. The ALJ refused to increase the income benefit by a factor of 0.02 on the ground that Douglas had a GED diploma and also rejected a request for sanctions under KRS 342.040 and KRS 342.310 on the ground that the employer's insurance carrier had a reasonable basis for refusing to pay temporary total disability (TTD) and medical benefits voluntarily. The Workers' Compensation Board (Board) and the Court of Appeals affirmed, and we affirm. The claimant began living with Douglas Lane in September, 1999, shortly before his sixteen-year marriage ended in a tumultuous divorce. Douglas began working for the defendant-employer in April, 2000, as a mechanic. It required regular lifting of up to 75 pounds and long periods of reaching overhead. The claimant testified that on July 28, 2000, Douglas experienced a sharp pain in his right shoulder while hammering and that he notified his supervisor before taking the rest of the day off. She testified that he continued to work thereafter but that he experienced increasingly severe pain in his shoulder, neck, and back, and co-workers had to help him.

The claimant testified that Douglas's health insurance had not become effective at the time of his injury because he had not been employed for six months. In early August she contacted the employer's workers' compensation carrier. She stated that she was told the claim would be investigated and that the carrier instructed her to submit Douglas's medical bills to his supervisor. She stated that she did so, but they were not paid. She stated that she contacted the carrier again in October and was told that it had not received the bills. She stated that Douglas's pain became so severe that he quit working altogether on November 13, 2000, and that the employer failed to file an injury report until then. At that point, the carrier's representative began to investigate the claim. Douglas completed a questionnaire, and the claimant requested a report from Dr. Alvarado, who had provided the initial treatment after the injury.

Based on Dr. Alvarado's notes and statements by Douglas's supervisor regarding a pre-existing shoulder problem, the carrier denied the claim and notified Douglas on December 4, 2000. The claimant testified that she contacted Dr. Alvarado immedi-

ately about his failure to include the work-related incident in Douglas's history and requested a corrected report, but his subsequent letter reiterated only that Douglas reported a 1995 accident. She testified that she also informed the carrier that the report was inaccurate but was told that the previous decision was final, a position that the carrier continued to maintain even after she submitted reports from Drs. Tutt and Kibler stating that the July 28, 2000, work-related incident had exacerbated pre-existing neck and shoulder conditions.

The claimant testified that Douglas was in constant pain, had difficulty sleeping, and had difficulty bathing or dressing without assistance. By mid-February, 2001, he had used the entire month's supply of prescription pain medication and had no income or health insurance to pay for more. He had also been ordered to appear in court on March 1 for non-payment of child support. She testified that when she was unable to rouse him that morning, she went to court on his behalf but was accused of being intoxicated and jailed overnight. That evening, Douglas's daughter visited him and informed him of the claimant's whereabouts. The claimant returned the next day and found him in bed, dead from a self-inflicted shotgun wound. She stated that amongst the sheets were Lortab and Klonopin pills that she had received for a work-related injury.

Dr. Alvarado's treatment notes indicated that he first saw Douglas on August 24, 2000, complaining of back, shoulder, and head pain. He reported that he had been involved in a 1995 automobile accident and that a physician in Michigan had prescribed Fioricet, Vicodin, and Soma. Douglas had since moved to Kentucky and relied on various over-the-counter medications. Dr. Alvarado ordered MRI imaging of the thoracic spine and right shoulder. The notes did not mention a recent injury or Douglas's work. As pertinent to this claim, Dr. Alvarado's assessment on October 9, 2000, included: cervical degenerative disc disease, spinal canal stenosis, and partial rotator cuff tear. He prescribed Lortab and recommended orthopedic and neurosurgical evaluations, noting that Douglas had assured him that he would have insurance coverage at the end of the month and would see the specialists then. In a letter dated December 7, 2000, and addressed "To Whom It May Concern," Dr. Alvarado reiterated the history he had noted on August 24, 2000. Based on that history, he did not believe that Douglas's back, shoulder, and head pain were caused by a work-related injury. Dr. Alvarado also indicated that he had dismissed Douglas as a patient and that any further statement would have to come either from him or his new physician.

Douglas first saw Dr. Tutt, a neurosurgeon, on December 28, 2000. He complained of neck and right shoulder pain and of numbness in his right arm since a work-related incident on July 28, 2000. Dr. Tutt noted significant cervical spondylosis and possible mechanical problems in the shoulder for which he referred Douglas to Dr. Kibler. In a letter dated June 4, 2001, Dr. Tutt stated that the July, 28, 2000, incident caused a pre-existing cervical arthritic condition to become disabling. In a subsequent letter, he stated that the cervical condition caused a 15% impairment and that the claimant was unable to work when he last saw him. After reviewing Dr. Alvarado's notes at the employer's request, he stated that if the history Dr. Alvarado recorded was correct, his own opinions regarding the cause of Douglas's cervical complaints would not be correct.

Dr. Kibler diagnosed a torn rotator cuff and concluded that the work-related incident had exacerbated a previous condition. He explained subsequently that he did not

know precisely when "the full clinical expression" of the rotator cuff tear occurred but that "obviously there was something going on before his injury but the clinical extent was not as bad as after the injury." In his opinion the resulting impairment was 4% and would have been 5% after surgery. As of January 9, 2001, he would have limited pushing and pulling and would have limited lifting to no more than 20 pounds regularly.

Among other things, the employer maintained that no work-related injury occurred on July 28, 2000; that Douglas failed to give timely notice of such an injury; and that his death was not work-related. An ALJ determined subsequently that Douglas did sustain the alleged neck and shoulder injuries, that he gave timely notice, and that his estate was entitled to his TTD benefits of $275.69 per week from November 14, 2000, until the date of his death. The ALJ concluded that Douglas would have been partially disabled had he not died. Income benefits of $157.14 per week were based on a 19% impairment and a finding that he would have lacked the physical capacity to return to the type of work he performed at the time of his injury. Noting the conflicting psychiatric testimony, the numerous factors that contributed to Douglas's mental state, the inability of the experts to state with reasonable medical certainty the reason for suicide, and Dr. Weitzel's testimony that it did not appear to be premeditated, the ALJ determined that it did not result from the work-related injury. As Douglas's surviving spouse, the claimant received 40% of his partial disability benefit ($62.86 per week) for 425 weeks under KRS 342.730(3).

In a subsequent proceeding, the claimant requested the imposition of sanctions against the employer under KRS 342.040 and KRS 342.310 on the ground that it

delayed unreasonably in paying TTD and medical benefits. The ALJ noted testimony by Tony Charles, the company's manager, that Douglas informed him of pre-existing shoulder problems when he was hired. He stated that Douglas's file contained nothing to indicate that he reported a work-related injury in July, 2000. Convinced that the testimony together with Dr. Alvarado's report and letter provided a reasonable basis for the employer to refuse to pay voluntary benefits and to defend against the claim, the ALJ denied the request. Finally, the ALJ determined that an argument that the claims adjuster failed to perform a timely or thorough investigation was a matter to be referred to the commissioner under KRS 342.267.

■ As amended effective December 12, 1996, KRS 342.0011(1) provides that an injury is a work-related traumatic event that is "the proximate cause producing a harmful change in the human organism." All of the harmful changes in the human organism that result from a work-related injury and that are not attributable to an independent, intervening cause are compensable. *See Beech Creek Coal Co. v. Cox*, 314 Ky. 743, 237 S.W.2d 56 (1951); *Elizabethtown Sportswear v. Stice*, 720 S.W.2d 732 (Ky.App.1986). The claimant alleged that Douglas's injury caused a number of harmful changes. Among them was his death.

■ The claimant bears the burden of proving every element of a workers' compensation claim, including causation. *See Magic Coal Co. v. Fox*, 19 S.W.3d 88, 96 (Ky.2000). Even when a worker's death occurs on the employer's premises, the burden is on one who seeks compensation to establish that the death was connected to the individual's work in order for it to be compensable. *See Stapleton v. Fork Junction Coal Co.*, 247 S.W.2d 372 (Ky. 1952); *Harlan Collieries v. Shell*, 239

S.W.2d 923 (Ky.1951); and *Bluegrass Pastureland Dairies v. Meeker*, 268 Ky. 722, 105 S.W.2d 611 (1937). KRS 342.0011(1) required the claimant to prove that the work-related traumatic event was the proximate cause of Douglas's death in order for her to qualify for death benefits rather than survivors' benefits.

KRS 342.610(3) generally bars compensation when a worker's death results from a willful intention to injure or kill himself or another; however, a suicide is compensable under KRS 342.750 if a work-related injury caused the individual to develop a mental disorder that impaired his normal and rational judgment and caused him to commit suicide. *Advance Aluminum v. Leslie*, 869 S.W.2d 39, 41 (Ky.1994); *Wells v. Harrell*, 714 S.W.2d 498, 501–02 (Ky.App.1986). KRS 342.680 addresses the problem of proving work-relatedness in instances where the injured worker dies and, therefore, is unable to testify. It authorizes a rebuttable presumption that the death was work-related if there is prima facie evidence that the death was work-related and no substantial evidence to the contrary. As we explained recently in *Williams v. White Castle Systems, Inc.*, 173 S.W.3d 231 (Ky.2005), the presumption shifts to the employer the burden of going forward with substantial evidence that the death was not work-related, but the burden of proving causation remains on the claimant. If the employer fails to meet its burden, the claimant is entitled to the presumption and prevails on the issue of causation. If the employer meets its burden, the claimant is not entitled to the presumption and must go forward with evidence persuasive enough to convince the ALJ that the death was work-related.

Dr. Shraberg and Dr. Weitzel, both of whom are psychiatrists, interviewed the claimant and reviewed Douglas's medical records. Testifying for the claimant, Dr. Shraberg stated that he did not know what Douglas's mental state was at the time of his death. He noted that a number of problems contributed to the suicide, including a difficult childhood, family relationship problems, an ongoing dispute over child support, and the effects of the injury. He thought that the claimant's description of Douglas's pain was consistent with the medical records and noted that her credibility was enhanced by the absence of any evidence that Douglas had been treated for mental problems before his injury. In his opinion, Douglas took an undetermined quantity of Lortab and Klonopin on the night before his death. He stated that depression was a possible side effect of those drugs and that the combination of pain and financial difficulties also would increase the risk for depression. Furthermore, the risk of committing suicide would have been increased greatly by "the assumption that he was in severe pain and treatment was [being] withheld." In his opinion, Douglas would not have committed suicide had he not sustained the work-related injury.

Dr. Weitzel reviewed depositions and reports from Douglas's co-workers and from Dr. Shraberg, records from the carrier, treatment notes from Douglas's medical providers, the claimant's deposition and handwritten journal, and various records regarding Douglas's divorce. His conclusion was that there was insufficient evidence of a causal link between the injury, by itself, and the subsequent suicide. Although he thought that Douglas warranted a diagnosis of depression, he noted that Douglas had not complained of suicidal or homicidal thoughts. Like Dr. Shraberg, he thought that many factors led to the suicide. In addition to pain from the injury, stressors included a lack of health care, the claimant's incarceration, a perceived

rejection and betrayal by Dr. Alvarado, and a history of abandonment in childhood. Dr. Weitzel thought that Douglas might have consumed some of the claimant's medication which caused him to become delirious, confused, and impulsive, making the suicide an impulsive rather than a premeditated act. Nonetheless, his opinion was that "none of the informed speculation that [he] or other physicians could offer in this matter rises to the level of reasonable medical probability."

When cross-examined by the claimant, Dr. Weitzel reiterated his opinion that Douglas committed suicide for a number of reasons and that eight to ten stressors contributed to causing it. Although Dr. Weitzel thought that the injury, inability to work, and financial pressures contributed to Douglas's depression, he refused to state that they were substantial factors in causing it. He also noted that Douglas might well have had financial difficulties even had there been no injury. He thought that the numerous stressors, particularly the claimant's incarceration, might have led to an impulsive act of suicide. There were no signs that it was premeditated.

██ The ALJ determined that Douglas's death was not work-related. Therefore, the claimant's burden on appeal is to show that the favorable evidence was so overwhelming that it compelled a favorable finding as a matter of law or that the ALJ applied an incorrect legal standard when considering the evidence. *Western Baptist Hospital v. Kelly,* 827 S.W.2d 685 (Ky. 1992); *Special Fund v. Francis,* 708 S.W.2d 641, 643 (Ky.1986). Focusing on Dr. Weitzel's written report and relying on common law negligence cases and workers' compensation cases that predate the 1996 amendments, she continues to maintain that the ALJ relied on Dr. Weitzel under the mistaken belief that "proximate cause" means "the only cause" rather than "a substantial cause."

██ We are not convinced that the ALJ applied an incorrect standard to the evidence of causation. The standard for proving causation in a common-law negligence action is not the standard applicable to workers' compensation cases. Workers' compensation is statutory, and the applicable version of KRS 342.0011(1) requires that work-related trauma must be "*the* proximate cause producing a harmful change in the human organism." (emphasis added). Under the amended definition, a harmful change with multiple causes is work-related if work is the proximate cause producing it (*i.e.,* the direct cause rather than merely a contributing cause). *See McNutt Const./First Gen. Services v. Scott,* 40 S.W.3d 854, 859 (Ky.2001); *compare Beth–Elkhorn Coal Corp. v. Dotson,* 428 S.W.2d 32 (Ky.1968).

Dr. Weitzel made it clear that he thought it impossible to be reasonably certain what had caused the suicide. Even Dr. Shraberg testified that he did not know what Douglas's mental state was at the time of his death and acknowledged that a number of factors probably contributed to it. There was substantial evidence from which the ALJ could reasonably conclude that the work-related traumatic event and its subsequent effects were not the proximate cause producing Douglas's impaired judgment and consequent suicide, and the evidence in the claimant's favor was not so overwhelming as to compel a finding to the contrary. Therefore, the claimant failed to establish that she was entitled to death benefits under KRS 342.750.

██ As amended effective July 15, 2000, KRS 342.730(1)(c)3 permits an income benefit to be enhanced based on age

and education. It provides, in pertinent part, as follows:

> Recognizing that limited education and advancing age impact an employee's post-injury earning capacity, an education and age factor, when applicable, shall be added to the income benefit multiplier set forth in paragraph (c)1 of this subsection. If at the time of injury, the employee has less than eight (8) years of formal education, the multiplier shall be increased by four-tenths (0.4); if the employee had less than twelve (12) years of education or a high school General Educational Development diploma, the multiplier shall be increased by two-tenths (0.2).

The claimant asserts that the ALJ erred by refusing to enhance Douglas's award by two-tenths because although he had a GED, he had only nine years of education. She argues that the statute permits the enhancement if the injured worker has less than 12 years of education, has a GED, or has both. In contrast, the ALJ, Board, and Court of Appeals were convinced that the words "had less than" were meant to be applied to both of the phrases that followed, meaning that a worker entitled to the enhancement must have less than 12 years of education or less than a GED. Although we acknowledge that either interpretation is grammatically correct, we are convinced that the legislature is not likely to have intended to equate a GED with less than 12 years of education. Mindful that a GED certificate is widely viewed as being the equivalent of a twelfth-grade education, we agree with the Court of Appeals' interpretation.

 Based on Dr. Alvarado's report and letter, which indicated that Douglas

attributed his neck and shoulder symptoms to a 1995 automobile accident and failed to mention a work-related injury, the employer's carrier refused to pay voluntary TTD or medical benefits. KRS 342.267 permits the commissioner of the Department of Workers' Claims to penalize an insurer or self-insurer for a bad-faith refusal to settle a workers' compensation claim or to pay voluntary benefits.[1] *The Travelers Indemnity Company v. Reker,* 100 S.W.3d 756 (Ky.2003). Although KRS 342.267 does not provide a civil remedy for a worker subjected to such conduct, KRS Chapter 342 does provide remedies within the workers' compensation litigation. *Id.* KRS 342.040 imposes an 18% interest rate rather than the usual 12% if a delay, denial, or termination of income benefits was "without reasonable foundation." KRS 342.310(1) permits costs and attorney fees to be assessed against a party who has "brought, prosecuted, or defended a claim without reasonable ground." The claimant sought and was denied those remedies. Appealing, she asserts that the insurer would have known that the claim was legitimate had it conducted a reasonable investigation and that its refusal to pay voluntary benefits was unreasonable in light of the evidence that ultimately convinced the ALJ to award them.

Upon notice of a work-related injury, 803 KAR 25:240, § 4 requires an insurer to "diligently investigate a claim for facts warranting the extension or denial of benefits." KRS 342.267 empowers the commissioner (now, the director) to fine an insurance carrier for a failure to investigate that is so unreasonable as to constitute an unfair claims settlement practice under Chapter 342 or under KRS 304.12–230. The Board and the Court of Appeals correctly noted, however, that whether the

---

**1.** Workers' Compensation claims are administered presently by the Office of Workers' Claims, the head of which is the executive director.

carrier conducted a diligent investigation is also a factor affecting the reasonableness of its decision to deny benefits or defend a claim. Nonetheless, a more thorough investigation in the present case would not have changed the fact that Dr. Alvarado's notes from Douglas's first visit on August 24, 2000, did not mention a July 28, 2000, work-related injury but did refer to a 1995 automobile accident. Nor would it have changed Dr. Alvarado's refusal to amend his notes when the claimant contacted him. The first medical evidence that Douglas attributed his present neck and shoulder symptoms to a work-related accident was found in Dr. Tutt's notes from December 28, 2000, after the carrier denied coverage. Under circumstances where another ALJ might have concluded reasonably that a work-related injury was not what caused Douglas's neck and shoulder problems, it could not be said that the carrier lacked reasonable grounds to refuse to pay voluntary benefits and to defend the claim.

The decision of the Court of Appeals is affirmed.

All concur.